John S. SMITH, Plaintiff–Appellee,

v.

James FRUIN, Robert Biebel, Stephen Kuhn, and William Murray, Defendants–Appellants.

No. 93–2839.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1994.

Decided June 30, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 15, 1994.

Richard J. Brzeczek, Brzeczek & Associates, Chicago, IL (argued), for plaintiff-appellee.

Lawrence Rosenthal, Deputy Corp. Counsel (argued), Frederick S. Rhine, Asst. Corp. Counsel, Terence J. Moran, Benna R. Solomon, Susan S. Sher, Office of Corp. Counsel, Chicago, IL, for defendants-appellants.

Before CUMMINGS, KANNE, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

John S. Smith, a Chicago police detective, brought suit against his superiors in the police department contending that they had given him a sham surveillance assignment as a punishment for voicing his concerns about smoking in his workplace. The appellants moved for summary judgment on the basis of qualified immunity. The district court denied the motion, reasoning that it should have been clear to the appellants that Detective Smith's complaints constituted protected speech on a matter of public concern, for which he could not be penalized. Because we conclude based on the undisputed facts that Detective Smith's complaints were in the nature of personal grievances rather than speech on a matter of public concern, we reverse.

## I. FACTS

At all times relevant to this action, Detective Smith was assigned to the Violent Crimes Section of the Chicago Police Department, Area 5. Commander James Fruin headed the Area 5 Detective Division until his retirement from the police force on July 9, 1991. Robert Biebel and Stephen Kuhn are both sergeants who supervised Detective Smith and other detectives in the Area 5 Violent Crimes Section during the relevant time frame. Sergeant William Murray has supervised case management for detectives assigned to the Violent Crimes Section of Area 5 since 1986.

In 1988, the Chicago City Council enacted the Clean Indoor Air Ordinance, declaring, "It is the purpose of this section and the policy of the city to provide smoke-free areas in enclosed public places and to regulate smoking in places of employment." Chicago Municipal Code § 7–32–030. The ordinance further provided that "[n]o employer shall ... in any manner retaliate against any employee ... because such employee ... exercises any rights afforded by this section." Chicago Municipal Code § 7–32–060(d). The Superintendent of Police subsequently issued Special Order 88–18, which instructed all employees of the police department to honor and enforce the provisions of the ordinance, directed supervisory personnel to establish smoke-free areas for non-smoking employees, and forbade retaliation against any department employee who exercised his or her rights under the ordinance.

Apparently, smokers at Area 5 headquarters frequently did not honor posted admonitions not to smoke in areas designated smoke-free. This prompted Detective Smith (who describes himself as particularly sensitive to tobacco smoke) to complain to Commander Fruin in January 1991 that the ordinance was not being enforced at Area 5. Detective Smith repeated the objection to Fruin in March, explaining that "I don't want people to quit smoking on my behalf. I just want a place to work where I don't have to smell their smoke." On both occasions, Commander Fruin told Smith that he would see what could be done. By April, however, Detective Smith's concerns had not yet been addressed.[1] He spoke once again to Commander Fruin that month, requesting a work location that was smoke-free and reiterating that he "didn't want to smell smoke anymore." He also made similar complaints to Biebel and Kuhn. Detective Smith subsequently explained at his deposition that he

---

1. The record does suggest that supervisory personnel were reminded of Special Order No. 88–18 during a staff meeting and admonished that its provisions were to be adhered to strictly.

had raised the issue with Commander Fruin solely on his own behalf:

Q. When you complained to Fruin about the smoking, did you complain only on your own behalf?

A. I don't speak for anyone else other than myself.

Q. So you were speaking for yourself when you complained to Fruin—

A. That's correct.

Q. —that the smoke bothered you in particular?

A. I don't implicate anyone else, just me.

Smith Dep. 48–49.

On April 24, 1991, Smith contacted the City Health Department. Smith apprised Stuart Sikes, an assistant to a Deputy Health Commissioner, that there was "too much smoke for him" at Area 5 Headquarters. Smith called Sikes once again a month later, reporting that "he was still being disturbed by cigarette smoke." In each instance, Smith described the problem only in terms of what he experienced personally; he did not report any incidents involving other non-smokers nor did he purport to speak on anyone's behalf but his own.

On June 12, 1991, Smith made a similar call to Lieutenant John Klein, Commanding Officer of the police department's Office of Legal Affairs. Again his complaint was framed in personal terms. Klein promptly initiated an inquiry into Smith's concerns, which culminated in the Chief of Detectives contacting Commander Fruin that same day.

On June 13, 1991, the day after Smith had contacted Klein, Sergeant Biebel advised Smith of a new assignment: beginning the following day, Smith was to station himself in an unmarked car in the 1500 block of North Austin Avenue from 9:00 a.m. to 5:00 p.m. and record the license plate numbers of all large dark blue, red, and maroon cars driven northbound by African American men. Commander Fruin had conceived of this as-

signment and approved Biebel's suggestion that it be given to Smith, whose usual purview was the investigation of sex crimes.[2] Smith contends that this assignment was concocted solely to punish him for his speech; the city contends that the assignment was not a sham, but instead was a genuine surveillance assignment initiated in conjunction with the investigation of a large-scale fencing operation taking place in that area. At this juncture of the proceedings, however, we will assume that Detective Smith's take on the assignment is accurate. Smith stationed himself as ordered and copied down license plate numbers for a total of twelve days over a three-week period. (No one else relieved Smith, either at the end of his shift or when he left his post for lunch; nor did anyone take his place on two days when he was absent from work for medical reasons.)

Columnist Mike Royko discussed Smith's plight in the July 4, 1991 issue of the Chicago Tribune. Royko quoted Smith as saying "I came to work on June 14, and my sergeant told me that the commander said that if I wanted a smoke-free environment, I was going to get a smoke-free environment." Mike Royko, *More tax money goes up in smoke*, Chicago Tribune, July 4, 1991, at A3. Royko went on to write:

> Those who follow the news probably have noticed that on any given day in Chicago, especially when the weather is hot, people are shooting, stabbing and bopping each other. They are grabbing purses, wallets, rings, chains, watches, emptying cash registers, crawling through open windows, jumping out of gangways, doorways and bushes.

> When you toss in the wife-beaters, the saloon brawlers, the flashers and peeping Toms, the drunken drivers, the teenage vandals and the assorted nuts and zanies, there isn't nearly enough police manpower to handle the mayhem and madness.

2. Although Murray was the case management sergeant in the Violent Crimes Section of Area 5, he claims not to have given Smith any assignment directly. Instead, his practice purportedly was to give assignments to the on-duty sergeant for a particular shift, who would himself assign cases to the detectives. However, Smith con-tends that Murray, as his watch commander, was directly involved in giving the surveillance assignment to him. Smith also avers that on one occasion during this assignment, Murray made it a point to drive by Smith's post in order to verify that Smith was on the job.

And here we have a cop with 20 years' experience, 14 as a detective, spending his workday jotting down the license numbers of black motorists who happen to be driving north on Austin Avenue.

Detective Smith has talked to attorney Richard Brzeczek, formerly police superintendent, and they might go into court next week and slap the department with a lawsuit. If they don't, some bungalow owner should, on the grounds that this is one hell of a way to spend his real-estate taxes.

In the meantime, I suggest that Police Supt. LeRoy Martin ask Detective Smith's commander to explain the purpose of Detective Smith's goofy assignment.

And if he doesn't get a suitable explanation, Supt. Martin should provide that commander with an environment that is not only smoke-free, but authority-free.

*Id.* Several days after the article appeared, Smith was removed from the surveillance assignment. Smith was subsequently disciplined for publicly criticizing his commanding officer without first pursuing the matter internally and for revealing to the public the details of an ongoing undercover operation; the propriety of this measure is not at issue here. No one was assigned to replace Smith on Austin Avenue, purportedly because the publicity had compromised the surveillance effort.

Smith brought suit in the district court under 42 U.S.C. § 1983, contending that his superiors had penalized him with the surveillance assignment for his complaints about smoking, in violation of his rights under the First and Fourteenth Amendments. *See Marshall v. Allen,* 984 F.2d 787, 789 n. 1 (7th Cir.1993).[3] At the completion of discovery, the defendants moved for summary judgment. In an initial ruling, the district court concluded that Smith's complaints about second-hand smoke qualified as protected speech on a matter of public concern within the ambit of *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). *Smith v. Martin,* 819 F.Supp. 733, 734 (N.D.Ill.1992). The court went on to conclude that whether the surveillance assignment was retaliatory or not was a disputed matter that could only be resolved at trial. *Id.*[4] In a second, unpublished opinion, the court rejected the appellants' defense of qualified immunity, reasoning that it was clear in June of 1991 (when Smith was given the assignment) that Smith's complaints amounted to speech on a matter of public concern and consequently that he could not be disciplined or penalized for voicing his objections. June 29, 1993 Mem.Op. and Order at 3–5, 1993 WL 243159.[5]

**3.** Although the focus of Smith's retaliation charge is on the surveillance assignment, we should note that Smith also asserts that the retaliation continued in a slightly different manner after the surveillance was discontinued. Although Smith had been working during the daytime shift, as was his preference, beginning in July 1991, he was placed on the 5 p.m. to 1 a.m. shift for seven months without rotation; following that he was reassigned to the midnight shift.

We should also point out that although the nature of the retaliation Smith has alleged may to some seem mild relative to the kinds of retaliation (*e.g.* demotion or discharge) frequently alleged in other cases, the degree of retaliation is immaterial to the issue we address. As we have recognized, even minor forms of retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures. *See Glass v. Dachel,* 2 F.3d 733, 741 (7th Cir.1993).

**4.** In the same opinion, the district court dismissed a second claim that the defendants had conspired to deprive Smith of his civil rights in

violation of 42 U.S.C. § 1985(3). The court found Smith's failure to allege the requisite " 'class-based, invidiously discriminatory animus' " fatal to this claim. *Smith,* 819 F.Supp. at 735 (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)).

**5.** In addition to Fruin, Biebel, Kuhn, and Murray, Smith also named then-Superintendent of Police Leroy Martin and Lieutenant Klein as defendants in his complaint. However, the district court concluded that Martin and Klein were entitled to qualified immunity based on the timing and limited extent of the information they had acquired of Smith's complaints. June 29, 1993 Mem.Op. and Order at 5. Smith has not challenged this ruling on appeal. Our references to the "defendants" are therefore restricted to the four remaining defendants who were denied qualified immunity.

The district court's denial of qualified immunity to the appellants is, to the extent it turns on a question of law, a final decision over which we have appellate jurisdiction under 28 U.S.C. § 1291. *Marshall v. Allen,* 984 F.2d 787, 789 (7th Cir.1993) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985)).

## II. ANALYSIS

As we explained in *Marshall,* "[t]he defense of qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" 984 F.2d at 791 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Thus, "[e]ssentially, qualified immunity is a defense 'contingent on the state of the law.'" *Id.* at 792 (quoting *Elliott v. Thomas,* 937 F.2d 338, 341 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1242, 117 L.Ed.2d 475 (1992)). When the law is settled on a particular point, public employees are expected to conform their conduct accordingly, and they may be held liable when they do not. On the other hand, they "need not predict [the law's] evolution, need not know that in the fight between broad and narrow readings of a precedent the broad reading will become ascendant." *Greenberg v. Kmetko,* 922 F.2d 382, 385 (7th Cir.1991). Accordingly, "[i]f it were not clearly established that their conduct violated the law at the time the officials allegedly acted, then they are entitled to qualified immunity." *Marshall,* 984 F.2d at 792 (citing *Siegert v. Gilley,* 500 U.S. 226, 231–32, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991));

*Glass v. Dachel,* 2 F.3d 733, 740 (7th Cir. 1993).

The precise question before us, then, is whether in July 1991 it was sufficiently clear that Detective Smith's complaints about smoking in the workplace fell within the protective scope of the First Amendment. That is a question of law that we examine de novo. *Glass,* 2 F.3d at 740. *Marshall,* 984 F.2d at 793. Of course, as this case comes to us at the summary judgment stage, we interpret the record in a light most favorable to Detective Smith, the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

What must be made manifestly clear is that not every word a public employee utters is protected by the First Amendment.[6] Rather, as the Supreme Court recently reiterated:

> To be protected, the speech must be on a matter of public concern, and the employee's interest in expressing herself on this matter must not be outweighed by any injury the speech could cause to "'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Connick, supra,* [461 U.S.] at 142 [103 S.Ct. at 1687] (quoting *Pickering v. Board of Ed. of Township High School Dist.,* 391 U.S. 563, 568 [88 S.Ct. 1731, 1735, 20 L.Ed.2d 811] (1968)). It is also agreed that it is the Court's task to apply the *Connick* test to the facts. 461 U.S., at 148, n. 7, and 150, n. 10 [103 S.Ct. at 1690, n. 7, and 1692, n. 10].

*Waters v. Churchill,* —— U.S. ——, ——, 114 S.Ct. 1878, 1884–85, 128 L.Ed.2d 686 (1994).[7] Our analysis in this case is focused on the first prong of the *Connick–Pickering* test, that is, whether Detective Smith's speech

---

**6.** When we say "protected," we are speaking only in terms of the public employer's ability to restrain or discipline the employee for the speech in question. Speech that does not address a matter of public concern and which is not protected in that sense may still be entitled to First Amendment protection in other contexts. *See Connick,* 461 U.S. at 147, 103 S.Ct. at 1690.

**7.** We have noted:
"[T]he purpose of the 'public concern' requirement is to distinguish grievances of an entirely personal character from statements of broader

interest concerning one's job, rather than to fix the boundaries of the First Amendment." *Swank v. Smart,* 898 F.2d 1247, 1251 (7th Cir.1990), paraphrasing *Flanagan v. Munger,* 890 F.2d 1557, 1563–65 (10th Cir.1989). The greater the potential social, as distinct from purely private, significance of the employee's speech, the less likely is the employer to be justified in seeking to punish or suppress it. *Eberhardt v. O'Malley,* 17 F.3d 1023, 1026 (7th Cir.1994).

addressed "a matter of public concern." *See Gray v. Lacke,* 885 F.2d 399, 410 (7th Cir. 1989); *Vukadinovich v. Bartels,* 853 F.2d 1387, 1390 & n. 5 (7th Cir.1988). We make that determination based on "the content, form, and context of a given statement as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690. Content is the most important of these factors. *Yoggerst v. Hedges,* 739 F.2d 293, 296 (7th Cir. 1984). Yet, as we have emphasized time and again, our inquiry must also take into account "the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" *Linhart v. Glatfelter,* 771 F.2d 1004, 1010 (7th Cir.1985); *see also, e.g., Marshall,* 984 F.2d at 795; *Colburn v. Trustees of Indiana Univ.,* 973 F.2d 581, 585–86 (7th Cir.1992); *Barkoo v. Melby,* 901 F.2d 613, 618 (7th Cir.1990); *Gray,* 885 F.2d at 411; *Vukadinovich,* 853 F.2d at 1389–91; *Hesse v. Board of Education of Township High School Dist. No. 211,* 848 F.2d 748, 752 (7th Cir.1988), *cert. denied,* 489 U.S. 1015, 109 S.Ct. 1128, 103 L.Ed.2d 190 (1989); *Callaway v. Hafeman,* 832 F.2d 414, 417 (7th Cir.1987); *but see Belk v. Town of Minocqua,* 858 F.2d 1258, 1263–64 (7th Cir.1988) (if content of speech is of public concern, employee's personal motivation to speak does not defeat finding that speech is protected).

In this case, the district court thought it beyond dispute that "the inhalation of second-hand smoke is a matter of public concern." 819 F.Supp. at 734; *see also* June 29, 1993 Mem.Op. and Order at 2. As the court pointed out, the City's enactment of the Clean Indoor Air Ordinance three years before Smith began to air his concerns established the public's interest in this subject. *Id.* at 3–4. And because it was clear long before July of 1991 that public employees enjoyed First Amendment protection for speech on matters of public concern, the court reasoned, the defendants could not reasonably have claimed any doubt about the state of the law vis á vis Smith's complaints. *Id.* at 4–5. The error we detect in the district court's reasoning lies in its premise: that because the *subject* of Detective Smith's

complaints was one of public interest generally, his statements about that subject were necessarily speech on a matter of public concern. As we explain below, we find as a matter of law that Smith's speech did not fall into this category. Consequently, we need not proceed further with the qualified immunity analysis; for only if Smith's remarks were speech on a matter of public concern would we have to inquire whether Smith's superiors reasonably should have understood them to be protected.

■ We have no doubt that the issue of second-hand smoke was a matter of widespread public interest in July of 1991; it certainly remains the subject of considerable public debate today. But the fact that an employee speaks up on a topic that may be deemed one of public import does not automatically render his remarks on that subject protected. *Hartman v. Board of Trustees of Community College District 508,* 4 F.3d 465, 471 (7th Cir.1993). The content and form of the employee's remarks, along with the underlying circumstances, including the employee's reasons for speaking, remain essential to this determination. *See Colburn,* 973 F.2d at 587; *Barkoo,* 901 F.2d at 618–19; *Egger v. Phillips,* 710 F.2d 292, 317 (7th Cir.1983) (en banc).

■ Our review of the record as a whole convinces us that Smith's complaints were entirely personal in nature. We use the word "personal" in two senses: on his own behalf and in his own interest. As the content of Smith's remarks makes clear, each time he raised the smoking issue, he spoke solely in terms of his own sensitivity to smoke and the difficulty he had experienced with smokers at Area 5 headquarters. He did not cite any difficulties experienced by other non-smokers, nor did he purport to speak on behalf of anyone but himself. *See Colburn,* 973 F.2d at 587. The relief he requested was likewise individual; he simply wanted a work environment in which he would not be exposed to second-hand smoke. Smith himself summed it up succinctly when asked at his deposition why he had raised the matter with his superiors and with the Health Department: "I'm a non-smoker and

I'm a runner, and I don't appreciate having to inhale other people's carcinogens."

Smith also chose to raise his concerns in a largely private setting. *See Colburn,* 973 F.2d at 587–88; *Callaway,* 832 F.2d at 417. With the exception of his complaints to the Health Department, each of his complaints was, so far as the record reveals, made to superiors within the police department on a one-to-one basis. Of course, the fact that the speech in question occurred in the context of private conversations does not necessarily signify that the speech is of private rather than public concern. *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979); *Colburn,* 973 F.2d at 588; *Gray,* 885 F.2d at 411. But given the content of Smith's remarks, the fact that they were made in the context of private conversations with his superiors tends to confirm their personal nature. *See Colburn,* 973 F.2d at 588. His inquiries to the Health Department arguably may have taken on a somewhat more public quality to the extent he sought assistance outside the chain of command within the police department. *See Glass,* 2 F.3d at 741.[8] Again, however, Smith's concerns were voiced solely in personal terms and for personal reasons, confirming that his motivation in speaking was personal. *See Colburn,* 973 F.2d at 586–87; *Barkoo,* 901 F.2d at 619.[9]

Because Smith's complaints were both motivated by and framed in terms of his own interests, they did not constitute speech on a matter of public concern. The public, we agree, had a significant interest in workplace smoking, as evidenced by the Chicago City Council's effort to guarantee non-smoking

workers protection from second-hand smoke. Yet, we cannot say that Smith's remarks were of intrinsically greater concern to the public than complaints concerning sexual harassment (*Gray,* 885 F.2d at 411; *Callaway,* 832 F.2d at 417), public education (*see Vukadinovich,* 853 F.2d at 1390–91; *Hesse,* 848 F.2d at 751–52), the appointment of a new police chief (*Linhart,* 771 F.2d at 1010–11), or the alleged requests of a city official for assistance in procuring sexual favors from other city employees (*see Hartman,* 4 F.3d at 471–72). We have found remarks on each of those topics not to constitute speech on a matter of public concern where, as here, they were made for purely personal reasons rather than a desire to air the merits of the issue. Thus, although the content of some remarks may lift the speech to the level of public concern even if the employee's reasons for speaking out are entirely self-interested, *see Glass,* 2 F.3d at 741; *Belk,* 858 F.2d at 1263–64, we do not think that the speech at issue here, focused as it was on the difficulties the speaker himself had experienced as a non-smoker, can be placed in this category. *See Barkoo,* 901 F.2d at 620.

At his deposition, when asked if there was any other reason why he had pursued the smoking issue, Smith did add: "It's the law" and "I'm paid to enforce the law. We're not to break it." This testimony could be read to reflect a concern with the integrity of the police department independent of Smith's own interests as a non-smoker. But given the plainly individual focus of Smith's complaints, this single remark offered after-the-fact in the midst of litigation does not, in our view, transform the character of Smith's speech. *See Limes–Miller v. City of Chicago,* 773 F.Supp. 1130, 1142–43 & n. 17

8. Indeed, the city cites Smith's decision to circumvent the hierarchy within the police department as a circumstance that would justify a decision to take adverse action against Smith for his speech. Appellees' Br. at 37.

9. Smith's remarks to the *Chicago Tribune,* of course, were printed in a highly public forum. *But see Egger,* 710 F.2d at 317 ("the factors which determine whether a story is newsworthy are hardly cotermin[o]us with the factors which determine whether the communication has societal ramifications, and, in any event, newspaper editors cannot decide the question for us"); *Gray,* 885 F.2d at 411. However, Smith does not

rely on this speech (and whatever adverse reaction the *Tribune* column itself may have provoked) as a basis for his claim. The focus of Smith's case is instead on his earlier speech and the surveillance assignment that he was allegedly given in retaliation for that speech. After the *Tribune* column appeared, Smith was removed from that assignment. We do note that the record reflects some question as to whether certain subsequent personnel decisions concerning Detective Smith were made in retaliation for his speech and/or his lawsuit. However, those matters are not before us.

(N.D.Ill.1991). At the same time, although citizens no doubt have an interest in how their government conducts its business, "[t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691. Thus, remarks that are otherwise personal in nature do not take on a public import due simply to the "supposed popular interest in the way public institutions are run." *Ferrara v. Mills,* 781 F.2d 1508, 1516 (11th Cir.1986) (quoted with approval in *Hesse,* 848 F.2d at 752, and *Vukadinovich,* 853 F.2d at 1391); *see also Barkoo,* 901 F.2d at 618.

■ We agree with the suggestion of Detective Smith's counsel at oral argument that a public employee ought not have to "form an organization" before her remarks will be deemed speech on a matter of public concern. Nor should she be required to call a press conference. *Barkoo,* 901 F.2d at 619. If a public employee speaks as a citizen on a matter of public concern, her speech is entitled to First Amendment protection whether she speaks as a lone individual or as the representative of many others, and whether she does so discreetly with her co-workers or in a more public fashion. *See Gray,* 885 F.2d at 411 ("the private nature of a statement does not 'vitiate the status of the statement as addressing a matter of public concern'") (quoting *Rankin v. McPherson,* 483 U.S. 378, 386–87 n. 11, 107 S.Ct. 2891, 2898 n. 11, 97 L.Ed.2d 315 (1987)); *Barkoo,* 901 F.2d at 619. And we do not mean to suggest that merely because the employee has a personal interest in the subject of her remarks, they do not constitute speech on a matter of public concern. As we observed in *Colburn,* "[m]any public employees who speak out about conduct within their places of employment have some interest in the institution of change, and this by itself would not prevent their speech from being constitutionally protected." 973 F.2d at 587 (citing *Breuer v. Hart,* 909 F.2d 1035, 1039 (7th Cir.1990));

*see also Glass,* 2 F.3d at 741. But where, as here, the speech and the underlying circumstances on the whole indicate that the employee was speaking as an individual employee pursuing personal interests, we are compelled to conclude as a matter of law that his speech was not protected by the First Amendment as speech on a matter of public concern. *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690.

We must also stress that we do not sit in review of the merits of Smith's complaints or the wisdom of the actions the police department allegedly took in response to those complaints. These are matters beyond our purview, once we have concluded that Smith's remarks did not constitute protected speech. *Connick,* 461 U.S. at 146–47, 103 S.Ct. at 1690. It may be, as the district court suggested, that Smith's superiors conducted themselves in a deplorable fashion. *See* June 29, 1993 Mem.Op. and Order at 1; 819 F.Supp. at 734. If so, Smith's remedies, if any, lie in the Chicago Clean Indoor Air Ordinance and the internal grievance procedures available to municipal employees.[10] Smith's only claim to federal jurisdiction rests on the First Amendment. Having concluded that Smith's complaints did not constitute speech on a matter of public concern, our intervention is at an end. ·

### III. CONCLUSION

Because Smith spoke solely on his own behalf and in his own interest in voicing his concerns about second-hand smoke within the Chicago Police Department, his speech was not protected by the First Amendment as speech on a matter of public concern. The defendants were therefore entitled to judgment in their favor on this ground; the district court need not have reached the question of qualified immunity.

REVERSED.

---

**10.** We concede that the remedies available under the ordinance are quite minimal. Section 7–32– 080(c) allows for fines of only $25 to $100 for violations of the ordinance.