Harry PARISH, Plaintiff

v.

Norman PAHS, in his official capacity as a LaPorte County Commissioner, Lee Mumaw, in his official capacity as Executive Director of the LaPorte County Building Maintenance Department, and LaPorte County, Indiana, by way of its LaPorte County Commissioners, in their official capacity, Defendants.

No. 3:93cv0026 AS.

United States District Court,
N.D. Indiana,
South Bend Division.

Jan. 4, 1995.

Joseph V. Simeri, South Bend, IN and Stephen A. Kray, LaPorte, IN, for plaintiff.

Shaw Friedman, LaPorte, IN, for defendants.

### MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

In the early morning of May 8, 1990, the defendants Norman Pahs (incumbent candidate for LaPorte County Commissioner) and Lee Mumaw (Executive Director of the LaPorte County Maintenance Building Department) saw plaintiff Harry Parish (a county janitor supervised by Mr. Mumaw) erecting a campaign sign for a candidate opposing Mr. Pahs in the Democratic primary. The defendants acknowledge that they saw Mr. Pahs exercising his First Amendment rights in this way. None of the parties acknowledged the presence of the other at the time.

Mr. Pahs won the primary, and went on to win re-election to the Board of County Commissioners. In mid-January, 1991, defendant Mumaw says that he went to the President of the Board of County Commissioners and defendant Pahs and informed them of problems he was having with plaintiff Parish over personnel violations. Mumaw, Parish's supervisor, decided to terminate Parish on January 24, 1991.

Mr. Parish believes that he was terminated in retaliation for expressing his political beliefs, a violation of his First Amendment rights. He has filed suit in this court under 42 U.S.C. § 1983, requesting reinstatement, compensatory and punitive damages, and attorney's fees. This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1343(a)(3).

The defendants filed a motion for summary judgment on November 16, 1994, to which the plaintiff responded on December 1, 1994. That response was stricken for failure to comply with filing requirements, but was reinstated on December 9, 1994 when the deficiencies were resolved. There has been no Reply by the defendants. This court, having carefully reviewed the parties' memoranda, is now prepared to rule.

### SUMMARY JUDGMENT

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Russo v. Health, Welfare & Pension Fund, Local 705,* 984 F.2d 762 (7th Cir.1993).

A thorough discussion of Rule 56 by the Supreme Court of the United States can be found in a trilogy of cases decided in 1986. *See, Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) [1]; and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards

---

1. For the judicial epilogue of *Celotex,* see *Catrett v. Johns–Manville Sales Corp.,* 826 F.2d 33 (D.C.Cir.1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

under which the record is to be analyzed within the structure of Rule 56.

■ The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56). A material question of fact is a question which will be outcome determinative of an issue in the case. The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

■ Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial.'" *Id.* The nonmoving party cannot rest on its pleadings. *Hughes v. Joliet Correctional Center,* 931 F.2d 425, 428 (7th Cir.1991), *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920–21 (7th Cir. 1994). Neither may the nonmoving party rely upon conclusory allegations in affidavits. *Cusson–Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir.1992). "The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion." *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990).

■ During its analysis, this court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Brennan v. Daley,* 929 F.2d 346, 348 (7th Cir.1991), *Smith v. Fruin,* 28 F.3d 646, 650 (7th Cir.1994). Furthermore, it is required to analyze summary judgment motions under the standard of proof relevant to the case or issue. *Anderson,* 477 U.S. at 252–255, 106 S.Ct. at 2512–14.

The 1986 Supreme Court trilogy was recently re-examined in *Eastman Kodak v. Image Technical Services,* —— U.S. ——, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), a case born in the context of antitrust law. The most that can be said for *Kodak* is that it did not tinker with *Celotex* and *Anderson,* and possibly involves an attempt to clarify *Matsushita.* This view is well supported by an in-depth academic analysis in Schwarzer, Hirsch, and Barrans, *The Analysis and Decision of Summary Judgment Motions,* 139 F.R.D. 441 (1992).

## DISCUSSION

■ In order to state a First Amendment retaliation claim for dismissal from employment, a plaintiff must show (1) that speech he engaged in was constitutionally protected under the circumstances, and (2) that the defendants retaliated against him because of that speech. *Caldwell v. City of Elwood, Indiana,* 959 F.2d 670, 672 (7th Cir.1992).[2]

■ As for the first element, whether a public employee's speech has protected status is a question of law determined by this court. *Wright v. Illinois Dept. of Children and Family Services,* 40 F.3d 1492, 1499–1500 (7th Cir.1994). The court notes that the defendants acknowledge that they saw Mr. Parish posting the competitor's sign. They also acknowledge that this conduct meets the test for "matters of public concern," and was expression protected by the First Amendment. This court thus need not wade through a public concern versus private motive analysis. *See generally Smith v. Fruin,* 28 F.3d 646 (7th Cir.1994). It is refreshing and appreciated to see parties concede the obvious. It is an unfortunate rarity.

The court can thus move to the second element of the test. This of course is where the parties disagree. While Mr. Parish contends that he was fired in retaliation for his political expression, the defendants maintain

---

2. There is of course no claim by the defendants that the plaintiff, a janitor, would qualify as a policy maker or confidential employee. Such employees may be fired for their political beliefs. *See Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

There is likewise no need for a lengthy analysis under *Pickering v. Board of Ed. of Township High School Dist.,* 391 U.S. 563, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968), because the defendants deny that the plaintiff's political statement had anything to do with his termination.

that Mr. Parish was fired for serious deficiencies in work performance and other personnel violations. The defendants have produced a laundry list of Mr. Parish's violations. Defendants' Memo, Exhibit A. The defendants argue that Mr. Parish has no proof that he was fired because of his expression, and in any event defendants can show a legitimate reason for his termination.

Just because Lee Mumaw and Norman Pahs saw Harry Parish erecting a sign supporting a rival candidate does not give Mr. Parish a lifetime tenure at the public trough. Such would be a travesty of public policy, substantially rewarding public employees who speak out in dissent against their superiors, thus significantly encouraging employees to create instances of public dissent for their own private benefit.

However, this court is equally concerned about creating legal hoops that encourage public employers to make up and exaggerate complaints about employees' performance in order to terminate them for what are actually improper reasons. Motivating employers to cover themselves by dredging up or even making up employee deficiencies is a very harmful policy.

That is not to say that in this case there is any indication that Mr. Parish put up a rival's sign to help ensure his job security—this court does not think that in the slightest. The point is that the law should not make it so difficult to terminate someone after such an incident that employees are encouraged to create dissension for job security. This is the sword-edge that the courts are forced to walk. These are not easy decisions. The federal courts have established standards which attempt to weed out legitimate terminations from those which should go through the expense of trial.

One good indication of an employer who is trying to cover an improper-motive termination is when after the protected speech, the employer compiles complaints and deficiencies reaching back before the protected speech. Back-dated reports are especially dubious and indicative that the employer is trying to cover a termination that is actually based on improper motives. Compiling previous employee deficiencies right after protected expression also tends to be indicative of an improper "cover," although probably less so than when reports are actually falsely back-dated, which does happen. Compiling previous employee deficiencies at some later time when the employee is actually terminated, possibly after the "straw that broke the camel's back," is still less suspicious, but all of these are more suspicious than documenting personnel problems as they occur.

The defendants have provided this court with a list of eighteen incidents when Mr. Parish was reprimanded or performed deficiently. Defendants' Memo, Exhibit A. Of these, twelve occurred before the sign-posting incident (between December 19, 1989 and May 7, 1990) and six occurred after (May 10, 1990 to August 14, 1990). The court does not find evidence of when this list was prepared. The plaintiff has provided a point-by-point refutation of these alleged performance problems. Furthermore, the plaintiff has filed statements of co-workers and others involved in many of the incidents which corroborate the plaintiff's side, and in some cases strongly refute or undermine the charges.

An affidavit of Fran H. Tibbot, who served as secretary to Mr. Mumaw in the Maintenance Department during the relevant time period, states that on January 10, 1991, Mr. Mumaw told her to ask the janitors to stay and shovel snow to make sure that the walks were clear. Defendants' Memo, Exhibit C. Ms. Tibbot states that Mr. Parish refused to do so, and left for home. Mr. Parish was presented with a written warning the following day. (This incident is not reflected in Exhibit A.) This was proximate in time to the date Mr. Parish was fired, January 24, 1991. This incident is strongly refuted by Mr. Parish's superior at the time, Mr. George Maynard, who states that he told Mr. Parish and the other janitors to go on home since it was quitting time and to come back the next morning to shovel the snow before the courthouse opened. Mr. Maynard says that Mr. Parish followed his instructions, and the sidewalks were shoveled and made safe before the arrival of the courthouse employees the following morning.

It is true that Mr. Pahs seeing Mr. Parish posting a competitor's sign might constitute evidence tending to raise an inference that Mr. Pahs would feel negatively toward Mr. Parish. However, there is also evidence that Mr. Parish volunteered to work on Mr. Pah's election campaign after the primary, and Mr. Pahs was aware of that as well. Ms. Ruth Ann Pagos, Mr. Pahs' campaign treasurer, stated in a deposition taken by the plaintiff that Mr. Parish volunteered to help in Mr. Pahs' campaign, and in fact served as a bartender at one of Mr. Pahs' campaign functions in October 1990. Pagos Dep. at 10–11. She states that Mr. Parish volunteered without hesitation to help at Mr. Pahs' rally, and Mr. Pahs showed no objection or concern about Mr. Parish's help at the rally. *Id.* at 22–23.

The plaintiff responds to this by stating that Mr. Pahs did not speak to him the entire night at the rally. He also states that when Ms. Pagos asked him to tend bar for the rally, he decided to do so to try to "ease the strain and tension that had arisen between Norman Pahs, Lee Mumaw, and myself over my supporting Robert Camareno in the Democratic primary. I figured it would not be wise to cause further trouble between us." Plaintiff's Objection to Defendant's Renewed Motion for Summary Judgment, Attachment 1 (Verified Statement of Harry Parish). That was and is a sensible statement, and renders Ms. Pagos' deposition testimony of little use in this motion for summary judgment.

The plaintiff has attached to his Objection to Defendant's Renewed Motion for Summary Judgment minutes from Board of Commissioners meetings showing that defendant Pahs nominated and renominated defendant Mumaw for Mr. Mumaw's appointment in the relevant years 1988 through 1991. Attachment 2. This evidence is intended to help show the political/personal connection between Mr. Pahs and Mr. Mumaw. Considering that there are only three members of the Board of Commissioners, and every county appointee had to be nominated by one of them, the evidence is fairly weak. However, it probably is relevant and material evidence.

The time lapse between the protected conduct and the termination—from May 8, 1990 to January 24, 1991—can be relevant to this analysis. Generally, the shorter the time lapse, the greater the inference of causality. The defendants cite several cases for the proposition that a several-month time span between an incident and a termination, without other evidence, is not enough to raise an inference of improper motive. Most of the cases cited by the defendants are irrelevant or distinguishable. For example, in *Parrott v. Cheney*, 748 F.Supp. 312 (D.Md.1989), *aff'd*, 914 F.2d 248 (4th Cir.1990), there was a five-month lapse between filing a grievance and not being promoted, but that was not the basis of the court's decision that causation was not shown. Causation was not shown because *four of the five candidates* had filed grievances, *including the candidate promoted.* 748 F.Supp. at 318. In *Valdez v. Mercy Hospital*, 961 F.2d 1401 (8th Cir.1992), there was a six-month lapse between an employer learning of an employee's filed charges and discharging the employee. However, there was no other evidence of retaliation and the employee had an unsatisfactory performance record, which for the most part he agreed was accurate. *Id.* at 1403.

It is true that long time lapses between an incident and alleged retaliation weaken any inference of causation. Of course, such timing evidence is never cut and dried. This court will not set forth a rule whereby employers can wait nine months and a day, and then fire with impunity. Employers are certainly sophisticated enough to take advantage of such a myopic judicial policy. This court will not agree with the defendants that an eight-month delay as a matter of law prohibits an inference of retaliation. There is no such hard and fast statute of repose on "inferences."

The plaintiff responds that he is not solely relying on the sign-posting incident for a causal connection to the firing—he also alleges other evidence that the termination was in response to the protected activity.

In addition to the evidence that Parish supported Camareno, and Pahs and Mumaw saw Parish posting the sign, the plaintiff states that on the day after the primary

election Mr. Pahs approached Mr. Parish, poked his finger in Parish's chest, and told Parish that he saw him putting up the sign and would not forget that. Parish says that Pahs was angry. Parish supports this with evidence that, very upset, he immediately went into the office of Shirley Ford (LaPorte County Assessor's Office) and told her about it. She has signed a statement to that effect.[3]

Mr. Parish has presented detailed evidence disputing the negative job performance evidence from the defendants—both the plaintiff's own statements, and the statements of others involved. There are point-by-point refutations of the defendants' contentions, and highly credible refutations at that.

To say that material factual issues exist is to greatly understate what has been presented to this judge.

## CONCLUSION

This court will not hesitate to enforce a public employee's First Amendment rights. Court intervention is sometimes "necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *See Rankin v. McPherson*, 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987); *Wright v. Illinois Dept. of Children and Family Services*, 40 F.3d at 1501–02. Employees of LaPorte County should not fear for their livelihoods if they do not support the election attempts of Mr. Pahs or any other politician. The law of this land will not condone that, and neither will this court.

Based on the evidence presented to this court, a reasonable jury could find that Mr. Parish was wrongfully terminated for his protected conduct, and the given reason for his termination was pretextual. The defendants' renewed motion for summary judgment is **DENIED. SO ORDERED.**

---

**3.** On December 14, 1993, the defendants filed a motion to strike the "Verified Statements" attached to the plaintiff's Response. This court found that motion moot when it denied the defendants' original motion for summary judgment. *See* Order of December 15, 1993. That motion to strike was not renewed, despite Mr. Parish's reliance on his original (October 28, 1993) Response in this renewed motion for summary judgment.

There is frankly no excuse for the failure of this plaintiff to conform his evidence to the Federal Rules of Civil Procedure, specifically Rule 56. The statements are signed, but are not sworn to and are not affidavits. However, the court notes

that in Shirley Ford's affidavit filed by the defendants, in which she complains that Mr. Parish's attorney procured her statement under possibly false pretenses, she does *not* say that her statement was false. She did not want it used in court, but that does not make it unreliable. Frankly, her concerns being presented now by the defendants' attorneys are indicative of a concern over unfavorable job repercussions for her true statement; hardly helpful in convincing this judge to grant summary judgment in favor of the defendants. The court hopes that the next First Amendment retaliation case is not filed by Ms. Ford.