In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2256

JIMMY W. BIVENS,

*Plaintiff-Appellant,*

*v.*

LARRY TRENT, JAY KEEVEN,
DIANE ROTTER, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 06 CV 00263—**William Stiehl**, *Judge.*

ARGUED SEPTEMBER 17, 2009—DECIDED JANUARY 6, 2010

Before POSNER, MANION, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* Jimmy Bivens, an officer in the Illinois State Police ("ISP"), discovered that he had elevated levels of lead in his blood due to lead contamination at the indoor firing range where he was stationed. He complained to his superiors, both directly and through a union grievance, about the safety of the working conditions. The firing range was immediately

analyzed and closed for environmental remediation. After he was denied workers' compensation benefits, Bivens sued his supervisors in the ISP, Larry Trent, Jay Keevan, Diane Rotter, Mark Beagles, and Roger Hayes, under 42 U.S.C. § 1983, claiming that they retaliated against him in violation of the First Amendment because he complained about the conditions at the firing range. The district court granted summary judgment in favor of all of the defendants. Bivens appeals. We affirm.

## I.

In October 2003, Bivens was assigned to the position of range officer for District 11 of the ISP. As range officer, he oversaw all aspects of the range's operation, including qualifying individuals on firearms and keeping the range clean and in good working order. The main purpose of the range was to provide firearm training and qualification testing to state police officers, but it also served as a facility for other state police training exercises and as a firing range for other police departments. Members of the general public also occasionally used the range, including hunters to set their shotgun sights and occasionally school children touring the facility.

By all accounts, Bivens did a great job of bringing order and cleanliness to the range, which resembled a "train derailment" when he arrived, and he received a written commendation just a month after he started. Within a few months, however, Bivens began to feel ill, with severe headaches, aching hips, and numbness and

tingling in his extremities. By February 2004, Bivens was concerned that his symptoms were caused by exposure to lead at the firing range. He first asked for a blood test through the firing range chain of command. When he did not receive a response within a couple of weeks, Bivens asked Master Sergeant Roger Hayes, his supervisor in District 11, to arrange a blood test. During that conversation, Bivens expressed concern about the safety of the facility. As a result of that conversation, and at Bivens's urging, Hayes sent a memorandum to Captain Jay Keevan, the District Commander for District 11, recommending that a lead test be arranged for Bivens. Keevan suggested that Bivens be tested for lead exposure at the county health department. After the health department would not perform the test, Keevan authorized Bivens to make his own arrangements, for which the ISP would reimburse him.

Bivens had his blood tested and on March 15 learned that his lead levels were "highly elevated." He informed Hayes of this that same day. On March 18, Bivens filed a grievance with the state police union for a violation of the safe working conditions provision of the collective bargaining agreement. He detailed his symptoms, tests, and previous complaints, and requested that the "range be professionally analyzed, cleaned, and repaired in such a manner as to render the facility safe of any health hazard with the prospect of a re-occurrance [sic] minimal." On March 19, the lead levels at the range were evaluated and found to be elevated. On March 23, the range was closed for professional clean-up. The closure of the

range received local media attention. It did not open again until November 2004.

In the meantime, Bivens's medical concerns continued. On March 23, he consulted Dr. Hogan, who performed a neurological exam and re-tested the lead levels in his blood. Dr. Hogan found no evidence of lead poisoning but ordered that Bivens be limited to desk work until the results of the lead test were received. After speaking with one of Bivens's supervisors, Dr. Hogan agreed that Bivens could return to light-duty work and amended his order accordingly. When the new lead test later showed normal lead levels, Dr. Hogan released Bivens to return to full work with the only restriction that he not be exposed to lead. Bivens sought a second opinion from Dr. Schrieber, a physician who had been recommended by Bivens's workers' compensation attorney. Dr. Schrieber recommended that Bivens not return to work until April 19. Bivens returned on that day and worked for one week, but continued to experience his neurological symptoms and stopped working again a week later. Because Bivens was absent from work due to a medical condition and receiving disability benefits, the ISP arranged for an independent examination of Bivens. Dr. David Peeples examined Bivens on May 10, and concluded that the neurological examination was normal and opined that Bivens could carry out any work so long as it did not involve lead exposure. Bivens still did not feel well, however, and Dr. Schrieber continued to opine that Bivens was suffering from cerebral deficits. In response, the ISP asked Bivens to visit a psychiatrist for an independent evaluation of his cerebral deficits.

Bivens was initially reluctant, but in late December 2004 he was examined by psychiatrist Dr. William Stillings. Dr. Stillings found no evidence of the disorders described by Dr. Schrieber and opined that Bivens was "simulating short-term memory deficits." Just as Dr. Peeples had found eight months earlier, Dr. Stillings concluded that Bivens was able to work without restrictions, as long as he was not exposed to excessive levels of lead. After Dr. Stillings's diagnosis, the ISP terminated Bivens's disability benefits and ordered him to return to work on January 21, 2005. Further, based on Dr. Peeples's and Dr. Stillings's medical findings and because the defendants were concerned that Bivens was faking his illness, the ISP did not allow Bivens to use his earned sick time to reduce his hours to cope with his illness and instead required him to use his personal time. After his personal time ran out, he only was paid for the hours he actually worked.

Bivens then filed a workers' compensation claim. He claimed that his illness was causally related to the lead exposure and that the medical services he received were reasonable and necessary, and challenged the amount of compensation he received for temporary total disability. On July 28, an arbitrator from the Illinois Workers' Compensation Commission held a hearing regarding Bivens's workers' compensation claims. On August 25, the arbitrator filed his decision with the Commission. The arbitrator was not persuaded by the opinions of Dr. Schreiber regarding Bivens's neurological damage and instead credited the lack of findings in the exams of Drs. Hogan, Peeples, and Stillings. The arbitrator did,

however, find that Bivens was injured by exposure to high lead levels and that he was totally disabled from March 15, 2004 until May 28, 2004. He also found that Bivens's medical expenses were reasonable, necessary, and related. Bivens filed a timely petition for review with the Commission, but the Commission affirmed the arbitrator's decision with only minor modifications.

Bivens next filed this action under 42 U.S.C. § 1983 against Larry Trent, Jay Keevan, Diane Rotter, Mark Beagles, and Roger Hayes, his supervisors at the ISP. He alleged that the defendants, while acting pursuant to their duties with the ISP, violated his First Amendment rights by retaliating against him because his grievance about lead levels at the range forced them to close the range for nearly nine months and caused the ISP public embarrassment. The alleged retaliation against Bivens included subjecting him to different workplace rules than his co-workers, disciplining him without justification by "docking his pay" (i.e., paying him only for hours worked when his personal leave ran out), refusing to allow him to use his earned benefit time by forcing him to use personal rather than earned sick leave, reassigning him to a different position, harassment, disclosure of confidential information, and dissemination of false information (that he was faking his illness) to co-workers.

The defendants moved for summary judgment on several grounds. First, they argued that the Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), foreclosed First Amendment protection for Bivens's

grievance about lead levels because the cleanliness and safety of the range were part of his official job duties. Second, they argued that if, and to the extent that, *Garcetti* did not foreclose Bivens's grievance, his speech would still not be protected because it was an entirely private grievance, unconcerned with any possible public concern that might attach to the same situation. Third, they argued that Bivens presented no evidence of a nexus between the allegedly protected speech and the alleged retaliation.[1] The district court granted the motion for summary judgment, holding that Bivens's speech was not protected by the First Amendment because it "was clearly related to and part of his official duties, and that he was not speaking as a private citizen." The court did not reach the other arguments raised by the defendants. Bivens appeals.

## II.

On appeal, Bivens argues that the district court erred in granting summary judgment to the defendants because it committed legal error in determining that his speech was not protected by the First Amendment. We review the district court's grant of summary judgment de novo. *Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008). The district court granted summary

---

[1] The defendants also argued that even if Bivens's speech was protected and even if he had shown enough evidence to save his retaliation claim, they were entitled to summary judgment under the doctrine of qualified immunity.

judgment based solely on its conclusion that *Garcetti* precluded First Amendment protection because Bivens spoke pursuant to his job responsibilities. However, we may affirm the judgment on any basis that appears in the record. *Id.*

To prevail on his § 1983 claim, Bivens must prove that (1) he engaged in constitutionally protected speech; (2) the defendants, as public officials, engaged in adverse conduct against him; and (3) the defendants were motivated, at least in part, by his protected speech. *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008). Like the district court—albeit for different reasons—we conclude that Bivens did not engage in constitutionally protected speech. Therefore, we need not consider whether Bivens can establish the other necessary elements,[2]

---

[2] We bypass the other elements in part because they were not addressed by the district court and were only superficially briefed by the parties. But based on our review of the record and the arguments that Bivens presented here and at the district court, we think it very unlikely that Bivens could prove that his union grievance motivated the allegedly retaliatory conduct in this case. All of the defendants' conduct, beginning with the termination of workers' compensation benefits three-and-a-half months after the union grievance, was ostensibly part of an ongoing dispute over the existence and severity of Bivens's illness. The only evidence that Bivens offers that his union grievance was a motivating factor for defendants' conduct—other than the unsupported assertion that the defendants were "undoubtedly embarrassed" by the media attention to the lead contamination at the range—is the fact that the

(continued...)

or whether the defendants are entitled to qualified immunity.

Although Bivens's employment with the ISP places certain limits on his freedom of speech, he does not lose all his First Amendment rights because of his public employment. Rather, his speech may, in some instances, be protected when he speaks "as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417. In *Garcetti*, the Supreme Court held that the First Amendment does not protect speech made by public employees when the speech is "pursuant to their official duties." 547 U.S. at 421. This is because when employees speak pursuant to their official duties they are not speaking *as citizens*, regardless of whether the speech is about a matter of public concern. *Id.*; *see also Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) ("After *Garcetti* . . . public employees speaking 'pursuant to their official duties' are speaking as employees, not citizens, and thus are not protected by the First Amendment regardless of the content of their speech."). It is undisputed that Bivens was responsible for the safe operation of the firing range and consequently that he had a responsibility, as part of his job duties, to report his concerns about environmental lead contamination. Thus, under *Garcetti*,

---

[2] (...continued)

conduct occurred after his grievance. But "suspicious timing alone rarely is sufficient to create a triable issue," *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006), and we see no evidence to suggest that the timing here was even suspicious, much less sufficient to create a triable issue.

it is clear that the complaints about lead contamination that Bivens made directly up the chain of command to his supervisors are not protected by the First Amendment. Whether the same exact speech may be protected when made through a different, yet still entirely internal, channel is less clear. But because we conclude that the union grievance—the only speech even arguably protected here—did not raise a matter of public concern, we need not reach that issue here.

Even assuming that he was speaking through his grievance as a citizen, rather than a public employee, Bivens must still establish that his speech addressed a matter of public concern to prevail on his First Amendment retaliation claim. *Connick v. Myers*, 461 U.S. 138, 147 (1983); *Pickering v. Bd. of Ed. Of Twp. High Sch. Dist. 205, Will County*, 391 U.S. 563, 568 (1968)*; Chaklos v. Stevens*, 560 F.3d 705, 712 (7th Cir. 2009). Whether a statement is a matter of public concern is a question of law for the court, and we answer this question by examining the "content, form, and context" of the statement. *Connick*, 461 U.S. at 147-48 & n.10; *Chaklos*, 560 F.3d at 712.

Here, the subject matter of Bivens's grievance was potentially of interest to the public, especially those members of the public who used the firing range. But this does not end the inquiry. While the content of the speech is the most important factor, *Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir. 2002), "the fact that an employee speaks up on a topic that may be deemed one of public import does not automatically render [his] remarks on that subject protected," *Cliff v. Bd. of Sch. Comm'rs of City*

*of Indianapolis*, 42 F.3d 403, 410 (7th Cir. 1994). Rather, the motive of the speaker is a relevant, though not dispositive, factor because speech will not be protected if the only point of the speech was "to further some purely private interest." *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999). Thus, although the fact that the speaker was partly motivated by personal concerns does not necessarily mean the speech cannot also be a matter of public concern, *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000), "if the speech concerns a subject of public interest, but the *expression* addresses only the personal effect upon the employee, then as a matter of law the speech is not of public concern." *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994) (citing *Smith v. Fruin*, 28 F.3d 646 (7th Cir. 1994)).

To resolve whether a personal grievance nonetheless raises to the level of public concern, "it is necessary to 'look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?'" *Kokkinis*, 185 F.3d at 844 (quoting *Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir. 1987)). We have held, for example, that a teacher's complaint about class size and discipline did not raise a matter of public concern when her complaint was in response to criticism of her performance, the complaint addressed only issues in her own classroom, and she only requested a reduction in her own class sizes. *Cliff*, 42 F.3d at 411. And we have held that a police detective's complaints about pervasive violations of an anti-smoking ordinance

did not rise to the level of a public concern where it was "focused . . . on the difficulties the speaker himself had experienced" and "made for purely personal reasons rather than a desire to air the merits of the issue." *Smith*, 28 F.3d at 652.

The question, then, is whether the context, form, and particular content (as opposed to the subject matter) of the speech indicate that Bivens complained for the purely private purpose of resolving a workplace issue. The context and the form of Bivens's grievance are consistent with the vindication of a personal interest, rather than a public concern, and the content of the griev-ance—while touching a subject of potential interest to the public—does not convince us that his purpose was any-thing other than personal. First, regarding form, Bivens spoke in the form of a union grievance that was entirely internal to the ISP. Although the fact that the speech was entirely internal does not itself render the speech unprotected, *see Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415-16 (1979), this fact does suggest that the grievance was personal in nature. *See Cliff*, 42 F.3d at 411; *Smith*, 28 F.3d at 652. Second, regarding context, the grievance arose as a result of Bivens's own illness and detailed his own exposure to environmental lead at the firing range. Finally, regarding content, the grievance made no reference to potential safety issues for the public and did not even suggest that the lead levels were high enough to endanger the public during occasional use. Moreover, the only justification cited in the grievance was a provision of the collective bargaining agreement guaranteeing a safe working environment. Thus, even if the public would

have been interested in lead contamination at the range, or would have benefitted from the remediation that Bivens requested, there is no indication that Bivens was attempting to bring an issue of wrongdoing or environmental safety to public light. Rather, the content, form, and context of the grievance demonstrate that it was filed for the sole purposes of securing his own medical treatment and ensuring he had a safe working environment.

That the public may have been interested in Bivens's grievance and may have benefitted from the resolution he requested does not raise the speech here to the level of public concern. Because Bivens's internal grievance was on a matter of purely private interest, addressing only the effect of lead contamination on himself and his work environment, it did not raise a matter of public concern and is not protected by the First Amendment.

### III.

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.