Rita GHOSH, M.D., Ph.D., Plaintiff,

v.

SOUTHERN ILLINOIS UNIVERSITY, Memorial Medical Center, Carl J. Getto, M.D., Robert C. Kaufmann, M.D., Tammie Klein, M.D., Paul H. Rockey. M.D., Scott MacGilvary, M.D., and Laura Powers, M.D. Defendants,

No. 04–1110.

United States District Court, C.D. Illinois.

Aug. 23, 2004.

Lance T. Jones, Jones Law Office, Springfield, MO, for Plaintiff.

Mark T. Dunn, Dunn Stanczak Willard & Arkell, Bloomington, IL, for Defendants Carl Getto, M.D., Robert C. Kaufmann, M.D., Tammie Klein, M.D., Paul H. Rockey, M.D., Scott MacGilvary, M.D., and Laura Powers, M.D.

## ORDER

MIHM, District Judge.

This matter is now before the Court on the Defendants, Motions for Summary Judgment. For the reasons set forth below, Southern Illinois University (hereinafter "SIU") and the Individual SIU Defendant's (Carl J. Getto, M.D.; Robert C. Kaufmann, M.D.; Tammie Klein, M.D.; Paul H.Rockey, M.D.; Scott MacGilvary, M.D.; and Laura Powers, M.D.) Motion for Summary Judgment [# 87] is GRANTED and Memorial Medical Center's Motion for Summary Judgment [# 90] is GRANTED.

## BACKGROUND

The Plaintiff, Rita Ghosh, M.D., Ph.D. ("Ghosh"), is a resident of the United States and her nation of origin is India. (Comp.¶¶ 9, 70.) Ghosh obtained Bachelor Degrees in Medicine and Surgery from Calcutta Medical College in 1985, then came to the United States in 1989 and received a Ph.D. in Physiology from The

Chicago School of Medicine. (Motion for Summ. Judg. SIU and Individual Defendants ¶¶ 7,8.) In or about October 1997, Ghosh applied for admittance to the residency program of several medical schools, including the Defendant, Southern Illinois University School of Medicine.

In early April 1998, Ghosh was living in India when she participated in a national "match program" which pairs medical school graduates with U.S. residency programs. (Ghosh Dep. 27–29.) She received a letter from SIUM notifying her of her acceptance to the Ob/Gyn residency program and that the program began on July 1, 1998. (Ghosh Dep. 29–30.) At that time, Ghosh did not have a visa which would allow her to study at SIUM, so she began the process of obtaining authorization from the Immigration and Naturalization Service. (Ghosh Dep. 31–32.) In order for Ghosh to obtain permission to work from the Immigration and Naturalization Service, she needed a temporary medical license. *Id.* As a result of several circumstances, including her inability to obtain the requisite temporary medical license in a timely manner, Ghosh was unable to begin the program until six weeks after the originally scheduled start date. (SIU Motion for Summ Judg. ¶¶ 13–23.) In addition to the six week delay in beginning her residency, Ghosh was also handicapped by the fact that she had received foreign medical training and she had been absent from clinical medicine for the last eight years. (Ghosh Dep. p. 96.)

On August 17, 1998, Ghosh entered a Physician's Agreement with Southern Illinois University Board of Trustees ("SIU"), St. John's Hospital ("St.John's"), and Memorial Medical Center ("MMC"), in which she accepted a position as a resident in the Department of Obstetrics and Gynecology. (Phys.Agree. p. 1.) Ghosh entered the Agreement to continue her education, with the ultimate goal of becoming a practicing Ob/Gyn. (Comp.¶ 36.)

In her deposition testimony, Ghosh testified that when she began her residency she did not feel welcome and that she thought the atmosphere was very discouraging, therefore not conducive to learning. (Ghosh Dep. p. 98–100.) In a meeting on August 20, 1998, with the Residency Program Director, Dr. Robert Kaufmann ("Kaufmann"), Ghosh was informed that she was not performing at the level of a fourth year medical student. (Ghosh Dep. p. 108.) Ghosh testified that she was capable of doing basic medical evaluations as they are done in India; however, she could not do a medical history or physical following the procedures used in the Unites States. (Ghosh Dep. p. 109–110.)

On August 31, 1998, Ghosh and Kaufmann met again to follow up their August 20, 1998, meeting. (Ghosh Dep. 137–140.) Kaufmann explained that her notes had improved to a sufficient level and that her knowledge base was improving; however, he expressed concern that while other residents had performed deliveries, Ghosh still had not. *Id.* Then on September 3, 1998, Kaufmann and Dr. Amy Hall ("Hall"), who was chief resident of the Ob/Gyn residency program, met with Ghosh and informed her that, for various reasons, over the previous seven to ten days, six patients had refused to allow her to provide treatment to them. (Ghosh Dep. 142.) During this meeting, Ghosh claimed that the problem had arisen because MMC nurses had been abusive and rude to her in the presence of patients by pushing her away from patients and acting like they were more knowledgeable in treating patients. (Ghosh Dep. 148)

As a result of these concerns, a simulated patient evaluation lab was scheduled to gauge Ghosh's performance with several "patients." (Kaufmann Dep. 34–35.) The

simulated evaluations were conducted by Ghosh on persons who were posing as patients, with observers evaluating the examinations from behind a one-way mirror. (Ghosh Dep. 157–160.) The observers commented that Ghosh did not make eye contact with patients, that she was not sympathetic or caring, and that she was hesitant or uncertain. *Id.*

On or about September 24, 1998, Ghosh received a copy of a memorandum from Dr. PonJola Coney, Chair of the Ob/Gyn Department at SIUM, and Ob/Gyn faculty member Dr. Erica Nelson, indicating that in order to get her up to speed after an eight-year hiatus from clinical medicine, her schedule would be changed for the next month and a half. (Ghosh Dep. 174–177.) Under this new schedule, Ghosh would only work in clinics with select faculty members instead of senior residents. (Ghosh Dep. 56.) While at first she thought that the plan was working well, Ghosh claims that the plan failed because some of the faculty that she was working with either did not know how to, or chose not to, teach her. (Ghosh Dep. 179–182.)

On October 8, 1998, Ghosh met with Kaufmann for her six-week evaluation, during which they discussed the summary report compiled from the Resident Education Committee and the Faculty Meeting. (Ghosh Dep. 203; Ex. 24.) The summary report indicated that Ghosh was having several major issues including: (1) her lack of personal responsibility; (2) her inability to follow instructions and/or advice given by senior residents; (3) her poor performance in clinicals, which was interfering with other residents' training; (4) her lack of medical knowledge. (Def.Ex. 24.) During this meeting, Ghosh was informed that her lack of personal responsibility and her inability to follow instructions given by senior residents must be immediately remedied and that any future infractions were unacceptable. *Id.*

She was later notified that she was required to provide some response to the summary report; however, she was also told that she could request another meeting with Kaufmann to discuss her evaluation, or if she did not want to meet with him, she could submit her concerns in writing. (Ghosh Dep. 211–213, 220–222; Def. Ex 25.)

Following her six-week evaluation Ghosh went on a vacation, during which she began preparing applications to other residency programs. (Ghosh Dep. 214, 357.) After she returned from vacation, Ghosh met with Coney, and she signed a copy of the summary report but noted that not everything in the evaluation was discussed with her during her meeting with Kaufmann and that she did not agree with the manner in which the report characterized her behavior. (Ghosh Dep. 215–216; Ex. 26.)

On or around October 28, 1998, Ghosh twice reported to Pat Hellmers ("Hellmers"), Ob/Gyn residency coordinator, that she was receiving "prank" pages while she was in the resident sleeping room at MMC. (Ghosh Dep. 224.) On both occasions, Hellmers directed Ghosh to approach Kauffman about these prank pages but she refused, and instead took the issue to Dr. Coney. (Ghosh Aff. ¶ 48; Ghosh Dep. 226.) After Ghosh's second complaint to Hellmers, Kaufmann contacted the nursing supervisors at MMC and St. John's, as well as Dr. Hall; following these calls, the prank pages ceased. (Ghosh Dep. 229–230; Kaufmann Dep. 48–53.)

From late October through November, more unfavorable reports of Ghosh's performance surfaced. On November 2, 1998, Kaufmann received a memorandum from Dr. Hall claiming that Ghosh was not attending checkout rounds, that she became angry and defensive when asked to do a post-op check, and that she had been ha-

bitually late for clinics. (Ex. 32.) Two days later, Kaufmann again received a memorandum, from faculty member Dr. Nichols–Johnson, indicating that while Ghosh seemed to be improving, she was still slow in seeing patients and that she needed to prioritize to become more efficient. (Ex. 95.)

On November 23, 1998, Ghosh met with Kaufmann and Hellmers to review her requisite three-month (August 17–November 17) evaluation. (Ans. Comp. ¶ 39; Ghosh Dep. 350.) The three-month evaluation was based on the written evaluations of Ob/Gyn faculty members Drs. Bradley, Nichols–Johnson, Saint, and Younkin. (Ex. 36–42.) The written evaluations commented that Ghosh was poor in the areas of self-confidence, interpersonal relations, patient/management, and knowledge base and concluded that she was functioning below the level she should be at. *Id.* Kaufmann further informed Ghosh that a decision regarding whether or not she would continue in the program would be made on or about March 15, 1999. (Ex. 43.)

Following the three-month evaluation, issues arose regarding Ghosh's record keeping and patient observation. In her deposition, Ghosh testified that she sometimes copied the notes of nurses' observations of patients' blood pressure, pulse, and cervical dilatation; however, she noted that the practice of residents copying nurses notes to patient records is routine. (Ghosh Dep. 321, 362.) Ghosh further testified that she would make it clear in the medical record when she was using someone else's patient evaluation. (Ghosh Dep. 366.)

On December 9, 1998, Dr. John B. Hammons, Assistant Professor in the Ob/Gyn program, was the attending physician supervising the residents in the Ob/Gyn clinic. (Trans. 24–25.) At the end of the clinic, Dr. Hammons would conduct a check-out session, at which time he would look at the patient charts, go over the notations made in the charts that day, and then sign-off on the charts. (Trans. 25) Dr. Hammons notified Ghosh that on several of her charts she did not properly document fetal movement, uterine contractions, loss of fluid from the vagina, or vaginal bleeding, which must be documented at each prenatal visit. (Trans. 25, 36.) When Dr. Hammons informed Ghosh that she should supplement her charts with data that she had gathered, she went back and annotated patients' charts with the information that she could remember from her earlier examinations. (Trans. 36; Ghosh Dep. 386.) Dr. Hammons informed Kaufmann of Ghosh's inconsistencies in filling out patient's charts. (SIU Ex. 51.)

Between September and December 1998, Ghosh and Dr. Kristen Green, a second-year resident in the Ob/Gyn program, had several confrontations. On separate occasions, Ghosh complained to Hellmers, Nelson, and Kaufmann that Green was treating her poorly and interfering with her work. (Ghosh Dep. 400, 403.) However, Ghosh did not file a written grievance against Green, although this was her right under the agreement. (Ghosh Dep. 410.)

On January 12, 1999, the faculty of the Ob/Gyn program met to perform the residents' six-month evaluations. They also decided at that time to evaluate Ghosh as well. (Kaufmann Dep. 142.) Kaufmann's expressed concerns that Ghosh could not perform necessary procedures, that she avoided and walked out on patients in emergency situations, that she could not adequately assess patients in emergency situations, and that she was misleading or falsifying patients' charts. (Kaufmann Dep. 129) Following the meeting, the faculty concluded that Ghosh should not continue in the program. (SIU Motion for Summ. Judg. ¶ 156.)

On January 26, 1999, Ghosh met with Drs. Kaufmann, Hammons, and McGuire, who was chief of the clinic at that time, to discuss the alleged falsification of patients' records. (Ghosh Dep. 401.) Ghosh was presented with the charts in question and asked about her notations. (Trans. 33.) Ghosh responded with alternative answers, including: that she had probably gone back to the patients and asked for supplemental information, that patients often spontaneously provided some of the necessary information, and that she had asked the patients for this information but that she did not think it was important to write it down. (Trans. 33.) On several occasions following the meeting, Ghosh claimed that Kaufmann, Green, and Hammons had mistreated her during the course of her residency.

On February 1, 1999, Kaufmann informed Ghosh in writing, that the On/Gyn faculty had voted and agreed to dismiss her and that her residency and the Agreement would be terminated on February 15, 1999. (MMC App. H.) Kaufmann notified Ghosh that she was being dismissed for the following reasons: (1) she had falsified information on patients charts; (2) she was unable to conduct routine Ob/Gyn procedures, despite extensive training; (3) she had failed to perform assignments from senior residents, provide adequate care for patients in emergency situations, and promptly respond to nurses' requests; and (4) she had interfered with the education of other residents by requiring that they perform her duties. (MMC Append. H.)

Pursuant to SIU's Resident Grievance Procedure, Ghosh submitted a grievance that claimed that SIU had not followed the policies of the Agreement or the Resident Grievance Procedure by not supplying adequate details in support of termination, that her dismissal was not the result of joint action by SIU and MMC, and that the charges contained in her termination were false. (MMC Append. K.) Ghosh was granted a hearing before the grievance Hearing Committee, including SIU faculty Defendants Drs. Rockey, Klein, MacGilvary, and Powers. On March 29, 1999, the Hearing Committee issued it's final recommendation to uphold the Department's decision to dismiss her from the Ob/Gyn program. (MMC Append. L.) The recommendation and report of the Hearing Committee was reviewed and agreed to by Carl J. Getto, Dean and Provost of SIU School of Medicine; Robert Clark, CEO of MMC; and Allison Laabs, CEO of St. John's. (SIU Ex. 57.)

Following her dismissal, Ghosh filed a plethora of formal and informal charges; complaints and requests for intervention, which included a co-filed complaint made to the Illinois Department of Human Rights and the Equal Employment Opportunity Commission, and a charge filed with the United States Department of Education, Office of Civil Rights. Ghosh further sued MMC in the Sangamon County Circuit Court alleging breach of contract, filed two unsuccessful appeals to the Illinois Court of Appeals, and filed two actions in federal court.

On March 18, 2002, the parties agreed to consolidate the two present federal actions. Following consolidation and extensive motion practice, two claims remain against the SIU Defendants: (1) Ghosh claims that she was fired in retaliation for exercising her First Amendment rights by speaking on a matter of public concern and (2) a 42 U.S.C § 1981 claim which prohibits racial discrimination in the enforcement of contracts. Ghosh also retains claims of discrimination and retaliation against MMC in violation Title VII. Now, the SIU Defendants and MMC move for summary judgment on all of remaining claims.

## DISCUSSION

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 2553. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex Corp.,* 106 S.Ct. at 2553. This Court must then determine whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. *Anderson,* 106 S.Ct. at 2511; *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995).

### I. *Claims Against SIU Defendants*

In accord with the Court's Orders following Defendants' Motion to Dismiss and the Agreed Motion to Consolidate, two claims remain against the SIU Defendants. Ghosh claims that she was dismissed in retaliation for speaking out on a matter of public concern when she complained of inappropriate conduct within the Ob/Gyn program, allegedly infringing her First Amendment right to freedom of speech. She also claims that SIU personnel discriminated against her in the enforcement of a contract in violation of 28 U.S.C. § 1981, when they terminated her Physician's Agreement. Each claim will be addressed in turn.

### A. *Retaliation for Exercising First Amendment Rights*

Ghosh claims that she was dismissed in retaliation for exercising her First Amendment right to freedom of speech by speaking out on matters of public concern. The alleged matters of public concern that she spoke out about include the abuse she allegedly suffered at the hands of senior residents and Kaufmann, the poor treatment of junior residents by senior residents, and the lack of teaching taking place in the Ob/Gyn program.

In order to establish a First Amendment retaliation claim, a plaintiff must show that her speech was constitutionally protected under the circumstances, and that the defendants retaliated against her because of that speech. *Ryan v. Illinois Dept. of Children & Fam. Services,* 185 F.3d 751, 758 (7th Cir.1999); *Button v. Kibby–Brown,* 146 F.3d 526, 529 (7th Cir. 1998). For a government employee's speech to be afforded protection by the First Amendment, the employee's speech must be on a matter of public concern and the interest in expressing herself on this matter must not be outweighed by any injury the speech could cause to "the interest of the State as an employer, in promoting the efficiency of the public services it performs through its employees." *Wright*

*v. Illinois Dept. of Children & Fam. Services*, 40 F.3d 1492, 1500 (7th Cir.1994) *quoting, Waters v. Churchill*, 511 U.S. 661, 688, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If Ghosh's speech cannot fairly be characterized as a matter of public concern then it is unnecessary for the Court to scrutinize the reasons for her dismissal. *Id.*

■] To determine whether an employee's speech addresses a matter of public concern, the Court must consider the content, form, and context of a given statement, as revealed by the whole record. *Id.* at 146, 103 S.Ct. 1684. Content is the most important of these factors in the analysis. *Smith v. Fruin*, 28 F.3d 646, 651 (7th Cir.1994). The inquiry must contemplate the point of the employee's speech: whether it was the employee's point to bring wrongdoing to light and raise issues of public concern, or was the point to further some private interest. *Id.* If Ghosh spoke about matters of personal interest, then "absent the most unusual circumstances, a federal court is not the appropriate forum in which to view the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147, 103 S.Ct. 1684.

Initially, the Court notes the argument that Defendants Rockey, Klein, MacGilvary, and Powers could not be liable under the undisputed facts, because none of these defendants participated in the decision to terminate of Ghosh. Ghosh admits that the decision to dismiss her from the

program was made by the faculty on January 12, 1999. These Defendants' only role in the process was as members of the Grievance Hearing Committee, which met on March 29, 1999, to hear Ghosh's appeal of her dismissal.

■] Ghosh presents no evidence to refute this assertion, nor does she attempt to dispute this issue in her summary judgment brief, or offer evidence that establishes that members of the faculty and Grievance Hearing Committee were conspiring to expedite her dismissal. Even when viewed in a light most favorable to Ghosh, she has not met her burden of establishing a claim against these Defendants. Because Ghosh failed to present evidence or raise any issue to counter this argument, no reasonable jury could find in her favor; therefore, summary judgment for defendants Rockey, Klein, MacGilvary, and Powers is appropriate. Accordingly, the Court finds that the First Amendment claim need only be addressed as it pertains to Defendants Getto and Kaufmann.

■ Getto and Kaufmann assert that summary judgment is appropriate because the issues that Ghosh spoke out about are not matters of public concern, instead only relating to her private interest. Ghosh claims that she spoke on a matter of public concern when she complained that she was mistreated by Kaufmann and the senior residents. Clearly, the point of Ghosh bringing these complaints was to further her own interest; nothing in the record indicates that she had any other motivation. While Ghosh testified in her deposition that she did not complain of abuse to anyone outside the University, she points to her affidavit where she claims that she complained to fellow resident Nelson, and charge nurses Jan and Trudy; however, none of these potential witnesses filed an affidavit or participated in a deposition. (Ghosh Dep. 626–27.) It is well estab-

lished law that self-serving affidavits without proper factual support in the record will not defeat a motion for summary judgment. *Slowiak v. Land O'Lakes, Inc.* 987 F.2d 1293, 1295 (7th Cir.1993) *citing, Karazanos v. Navistar Int'l Transportation Corp.,* 948 F.2d 332 (7th Cir.1991). Furthermore, Ghosh did not present evidence that would suggest that her complaints served any purpose other than to promote her private interest and address her own personal situation in the program. Therefore, Ghosh's claim that she was retaliated against for voicing her perceived mistreatment by Kaufmann and senior residents is not protected speech under the First Amendment because her speech was not pertaining to a matter of public concern.

Next, Ghosh claims that the poor treatment of junior residents by senior residents and inadequate teaching in the Ob/Gyn department are matters of public concern. In her deposition testimony, Ghosh testified that she voiced these complaints to Kaufmann, Hellmers, and Coney. (Ghosh Dep. 626.) To further support this position, Ghosh also cites to a periodic internal review report that states that many housestaff and several faculty members viewed Kaufmann as untrustworthy and inconsistent. However, this evidence is insufficient to present a triable issue of fact.

▮ Ghosh specifically testified in her deposition, "I also complained about senior residents not treating the other residents too well...[and] about senior residents and faculty not [being] interested in teaching." While an employee's speech need not relate to a large, vital, or globally significant issue to be protected, it must relate to more than personal grievances or private issues. *Dishnow v. Sch. Dist. of Rib Lake.* 77 F.3d 194, 197 (7th Cir.1996); *Gonzalez v. City of Chicago,* 239 F.3d 939, 941 (7th Cir.2001). Ghosh does not claim that the lack of teaching presented a risk

to the public that would stem from residents receiving inadequate teaching while attending to patients, nor does she make any reference to a situation that would endanger the public or pose a patient care risk.

The extremely limited evidence that Ghosh presents on this issue does not suggest that these comments were more than personal grievances, as the extent of Ghosh's evidence is limited to her deposition testimony, in which she makes the bare claims that she made these complaints. However, her claims are not supported by any reference to any specific incidents or how those incidents relate to the public. Based on this record, a reasonable jury could not find that, given the content, context, and form of Ghosh's statements, her purpose was to raise an issue of public concern. Consequently, the Court finds Ghosh's statements cannot satisfy the first prong of the *Connick* test because she did not speak out on a matter of public concern.

Hence, summary judgment is appropriate for the Defendants Rockey, Klein, MacGilvary, and Powers because their only role in Ghosh's dismissal was as members of the Grievance Hearing Committee. Further, summary judgment for Defendants Kaufmann and Getto is also proper on her First Amendment claim because Ghosh has not met her burden of presenting adequate evidence that she spoke on a matter of public concern. Accordingly, the Court finds that summary judgment is appropriate for all of the ISU Defendants on the issue of retaliation for exercising her First Amendment right to free speech.

**B. *Discrimination in the Enforcement of a Contract: 42 U.S.C. § 1981***

Ghosh claims that she was the object of discrimination based on her national origin

when her contract was terminated, allegedly in violation of 42 U.S.C. § 1981. She claims that she was terminated and not allowed to complete her first year of residency, while in years prior, two American first year residents were terminated, but were still allowed to complete their first year of residency. Thus, Ghosh alleges discriminatory treatment in connection with her employment contract because of her national origin as an Indian. Pursuant to the Court's Order following the Defendant's Motion to Dismiss, the Section 1981 claim remains only against ISU Defendants.

Section 1981 prohibits discrimination in the creation and enforcement of contracts. Specifically, the statute provides: "All persons within the jurisdiction of the United States shall have the same right...to make and enforce contracts...includ[ing] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a)-(b).

Discrimination claims brought under Section 1981 and Title VII of the Civil Rights Act are analyzed under the same rules. *Bratton v. Roadway Package Sys., Inc.,* 77 F.3d 168, 176 (7th Cir.1996). Thus, to prevail on a claim of discrimination based on alleged disparate treatment, proof of intentional discrimination is required. *Eiland v. Trinity Hospital,* 150 F.3d 747, 751 (7th Cir.1998). An employee may demonstrate her employer's intentional discrimination by providing either direct or indirect evidence. In this case, Ghosh claims to have both direct and indirect evidence of discrimination.

Direct evidence is evidence which, "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 347 (7th Cir.1997). The standard for establish-

ing discrimination through indirect evidence was outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). According to that standard, "a plaintiff must first establish a *prima facie* case of discrimination based on race." *Freeman v. Madison Metropolitan School Dist.,* 231 F.3d 374, 379 (7th Cir.2000). If the *prima facie* case is met, "the plaintiff has established a presumption of discrimination, and the defendant bears the burden of production to provide a legitimate, non-discriminatory reason for the challenged action." *Freeman,* 231 F.3d at 379. "Once the defendant meets that burden, the plaintiff must establish that the reasons proffered by the defendant were pretextual, by presenting direct evidence that [her] race played a role in the challenged action or indirectly by creating a genuine issue of material fact regarding the sincerity of the proffered reasons for that action." *Id.*

As stated above, the Defendants Rockey, Klein, MacGilvary, and Powers could not be liable under the undisputed facts, because none of these defendants participated in the decision to terminate of Ghosh. Ghosh admits that the decision to dismiss her from the program was made by Kaufmann on January 12, 1999, and these Defendants' only role in the process was as members of the Grievance Hearing Committee, which met on March 29, 1999, to hear Ghosh's appeal of her dismissal. Ghosh has not presented evidence that establishes that the faculty and Grievance Hearing Committee were conspiring against her; therefore, summary judgment for Rockey, Klein, MacGilvary, and Powers is appropriate on this claim, as well.

Ghosh presents very limited direct evidence in support of her claim of discrimination. Again, direct evidence is evidence which, "if believed by the trier of fact, will prove the particular fact in question with-

out reliance upon inference or presumption." *Plair*, 105 F.3d at 347. Ghosh repeatedly refers to conversations with Green and Nelson, during which she claims they expressed concerns that she was being treated unfairly because she is not white. However, neither of these witnesses were deposed or filed an affidavit. Consequently, Ghosh's reliance on this evidence is inappropriate because this evidence is inadmissible hearsay, and the Court cannot consider it for summary judgment purposes.

Ghosh does point to a meeting, which occurred shortly after she arrived, with Kaufmann and Hall where the subjects of Ghosh's accent, nationality, and skin color came up. These comments were made in the context of Ghosh's work in the residency program, specifically with respect to the clinical aspect of her work. There is no dispute that Ghosh is Indian and spoke with an accent. Ghosh testified in her deposition that Kaufmann and Hall stated this may have been contributing to her problems in clinicals because "people are biased and prejudiced against you if you're not white, if you speak with an accent. Nurses will probably not like you if you're not white." (Ghosh Dep. 271–23).

■ There is no dispute that the topic of Ghosh's accent and skin color came up when discussing challenges that she was facing in her residency. Kaufmann and Hall were merely pointing out that such prejudices exist in third parties, and that those prejudices might be hindering Ghosh in her clinical work. The trier of fact would have to make a major and unreasonable inference to conclude that because Kaufmann commented on the difficulties that Ghosh could face as a result of the prejudices of third parties, that somehow Kaufmann himself was acting in a discriminatory manner. Because the trier of fact would have to rely upon inference or presumption to conclude that Kaufmann's comment is evidence of discrimination, the Court finds no direct evidence of discrimination.

■ Absent direct evidence of discrimination, Ghosh must rely on indirect evidence to prove intentional discrimination. To demonstrate discrimination based on indirect evidence, Ghosh must establish a four part *prima facie* case including:(1) she is a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) the employer treated similarly situated individuals not in the protected class more favorably. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Gonzalez v. Ingersoll Milling Machine Co.*, 133 F.3d 1025, 1035 (7th Cir.1998).

It is undisputed that Ghosh satisfies elements one and three of her *prima facie* case of discrimination: Ghosh is Indian, and she suffered a materially adverse employment action when the Agreement was terminated. However, the second and fourth prongs of the test require further scrutiny.

After numerous issues arose concerning Ghosh's ability to do a patient's chart, conduct a physical, and communicate with patients, it is undisputed that Ghosh showed improvement in specific technical skills. On August 31, 1998, Kaufmann informed Ghosh that her notes had become acceptable and that her knowledge base seemed to be improving. He also noted that her technical skills in digital cervical evaluation were fine.

Furthermore, Nelson informed Kaufmann that she believed Ghosh was inexperienced but not incompetent and that one of her big problems was that the residents were treating her poorly. Nelson also stated that it seemed that the senior residents did not want to teach her and she felt that Ghosh deserved a "fair trial."

However, Nelson also signed a summary of the faculty evaluation of Ghosh, which listed many shortcomings including her lack of personal responsibility, her failure to follow instructions of faculty and senior residents, and that she was late for clinics and could only see a few patients because she was too slow. Hall also admitted that Ghosh did not attend some checkout rounds and that she had been habitually late for clinics even after being instructed that punctuality is essential.

In a memorandum to Kaufmann, Nichols–Johnson stated that after working with Ghosh for several weeks, she demonstrated improvement in her clinical skills. However, while she commented that Ghosh had shown progress, she was still slow at seeing patients and gathering information. To meet her expectations, Nichols–Johnson felt that Ghosh should take on some of the teaching and management of the clinics, but Ghosh had done little of this and Nichols–Johnson wanted to see how this area improved. In her three month resident evaluation, Nichols–Johnson discussed that while Ghosh was improving she was still functioning at a below average level.

Three other relevant resident evaluations were used to compile Ghosh's three month evaluation. Bradley's report states "Unfortunately, she should *not* be in this residency program." The report filed by Saint notes "[Ghosh] has written an order in contradiction to an order already written by me. Very insecure." Younkin's report continued, "She's very limited...prognosis = poor." After reviewing these reports, Kaufmann informed Ghosh that "she was functioning most of the time at a level of a first year resident, but just barely." Kaufmann suggested changing Ghosh's rotation to allow her more time on the OB floor, but she refused.

Even though Ghosh has presented limited evidence on this issue, when the facts are construed in the light more favorable to Ghosh, a reasonable jury could find that Ghosh's performance had improved to the point that she was meeting SIU's legitimate expectations. Thus, the Court cannot find, as a matter of law, that Ghosh has not satisfied the third prong of the *McDonnell Douglas* test.

The remaining prong of the *McDonnell Douglas* test requires Ghosh to demonstrate a genuine issue of material fact as to whether similarly situated individuals outside of the protected class received more favorable treatment. Specifically, she must demonstrate that similarly situated residents who were not Indian were performing at the same or lower level yet received more opportunities to succeed than Ghosh. Ghosh has identified Dr. Larry Shaw and Dr. Sabrina Smith as U.S. citizens who she claims exhibited greater deficiencies than her, but were allowed to finish their first-year of residency.

Similarly situated employees are employees who are "directly comparable to [her] in all material respects." *Grayson v. O'Neill,* 308 F.3d 808, 819 (7th Cir.2002) *citing Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir.2002). A plaintiff must show "a 'substantial similarity' between their positions, such as a common supervisor and similar standards governing their performance." *Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 617–18 (7th Cir.2000).

Dr. Smith is a U.S. Citizen who graduated from Indiana School of Medicine in October of 1995, and completed eight months of transitional residency training from St. Vincent Hospital in June of 1996. While Ghosh entered into her Physician's Agreement and began her residency six-weeks late on August 17, 1998, Smith began her residency on June 1, 1996. The Physician's Agreement entered into by

Smith is substantially similar to the one signed by Ghosh.

SIU's main claim is that because Ghosh began her residency with severe shortcomings compared to other first-year residents, no similarly situated first year residents exist. Evidence indicates that Ghosh started her residency with three substantial disadvantages: she had received a foreign medical education, she had been out of clinical medicine for eight years, and she had started the program six-weeks late. However, SIU did accept Ghosh to the program knowing of these deficiencies and, while issues with her performance persisted, she did demonstrate improvement.

A memorandum by Chief Resident Dr. Meredith McDonald and an evaluation by Chief Resident Mel Kurtulus establish that Smith also began her residency at a level below that which was expected of a first-year resident. Furthermore, Ghosh does provide an evaluation summary provided by Kaufmann which states that Smith had many deficiencies early on in her residency. This evaluation indicates that Smith was:

1) Frequently late to all activities; 2) not responding immediately to pages; 3) not responding to senior residents and nurses when asked to see a patient; 4) making excuses; 5) not completing patient evaluations; 6) appearance of trying to avoid work; 7) non-willing to learn attitude; 8) inappropriate comments to residents, patients, attendings, and staff; 9) inappropriate comments in front of staff; 10) lazy attitude and work habits; 11) not notifying chief residents of problems; 12) not asking for help with problem patients; 13) Not asking for help when she is "over her head" with a problem; 14) threatening other resident that "If you're not nice to me, I'll call my husband and have him beat you up"; 15) inappropriate calls by husband to chief resident.

Kaufmann also noted that Smith had a poor knowledge base and technical skills.

In light of these deficiencies, Smith accepted a rotation schedule change which lasted from October 1996 until March of 1997. However, when Ghosh was given the option of changing her rotation schedule in November she refused. A summary evaluation dated September 17, 1996, stated that Smith had not improved from the prior evaluation.

Smith was also informed that she was on a probationary period that would last through January and was given three courses of action that SIU could take, none of which included termination of the Physician's Agreement. When Ghosh was put on probation she was merely informed that her position would be evaluated sometime around March 15, 1999.

Evaluations from Smith's E.R. rotation during October 1996, demonstrate that she experienced continued problems. Comments included: "falls asleep a lot while on duty...poorest performance by a resident since I have been here (9 years)...I would hate to send my wife or daughter to such an Ob/Gyn physician based on her behavior." However, these evaluations also reveal that she had demonstrated improvement in certain areas, as some evaluations contained favorable scores. In comparison with Ghosh, Smith had a substantially similar experience in that both had similar performance issues and they each showed some improvement.

Following continued evaluations that demonstrate Smith's limited knowledge base, poor attitude, and difficulties with patients, Coney recommended non-renewal of Smith's contract. Coney sited several performance issues that are similar to those noted with Ghosh: failure to assume independent work efforts in clinical situa-

tions, failure to elicit assistance, lack of attention to detail, and patient problems. On January 23, 1997, Kaufmann notified Smith that SIU would not be renewing her contract at the conclusion of the year.

Like Ghosh, Smith filed a grievance regarding the decision for non-renewal of her contract. The Resident Grievance Committee noted similar complaints to those that they noted with Ghosh including defensive behavior in the face of criticism and offering excuses when faced with negative feedback. As with the joint decision to terminate Ghosh, Getto, Labbs, and Clarke joined in the findings of the Grievance Committee to not renew Smith's contract. Therefore, viewed in the light most favorable to Ghosh, a reasonable jury could find that Ghosh and Smith are similarly situated individuals, satisfying the fourth prong of the test.

Dr. Larry Shaw is a U.S. citizen who graduated from the University of California College of Medicine in June 1997. He began the Ob/Gyn residency on July 1, 1997. In the summary of Shaw's six week evaluation, Kaufmann noted that he had problems prioritizing and he missed two deliveries when he needed to attend all of them. Other criticisms that were similar to those Ghosh experienced were that he was slow doing a patient history, avoided the issues, and wouldn't tell you what he thinks.

The record is limited as to the extent of Shaw's problems. Shaw's three month evaluations state that his diagnosis were hard to follow and that he was slow in making decisions. His six month evaluations note that he gives the impression of uncertainty and a lack of self confidence. In response to these issues Shaw was given several options, all of which included a transfer to the SIU Family Practice residency. Shaw accepted the transfer and graduated from the Family Practice residency.

The limited evidence provided by Ghosh does not indicate that Shaw experienced the same severity of issues that Ghosh did. Apparently, the main issues that Shaw faced was that he was slow in his evaluations and had some issues with the appearance of uncertainty. Ghosh had issues with her knowledge base, blaming other individuals for her own shortcomings, and persistent issues with patient evaluations.

 While Ghosh and Shaw faced some similar problems in their respective residencies, their issues were not substantially similar. SIU offered to transfer Shaw to the Family Practice residency because of his limited issues presented in the record. The Court cannot delve into the academic decisions made by a university when the record does not indicate that the students are substantially similar. Therefore, the Court finds that Ghosh has not satisfied the fourth prong of the test with respect to Shaw, and only Smith was a similarly situated individual.

 Now that Ghosh has successfully established the *prima facie* case of discrimination, "the defendant bears the burden of production to provide a legitimate, non-discriminatory reason for the challenged action." *Freeman* 231 F.3d at 379. To meet this burden, SIU asserts that the decision to terminate Ghosh from the residency was simply an academic decision and that the Court may not intrude into the academic decision making process. However, under the *McDonnell Douglas* test, the Court evaluates the individual as an employee and not as a subjectively evaluated student, thus the Court must question if the defendant has presented evidence that SIU had a legitimate reason for dismissing Ghosh from the program.

The record contains substantial evidence that indicates Ghosh was not performing at the level expected of a first-year resident, as evidenced by her six-week and

three-month evaluations. The Grievance Hearing Committee unanimously agreed that she lacked accountability for her own education, did not adequately fulfill some patient care duties, did not recognize of her own limitations, and that her constructive relationships with faculty, other residents, and nursing staff were poor. Therefore, the Court finds that SIU has met it's burden of production to provide a legitimate, non-discriminatory reason for dismissing Ghosh, that being that she was performing at an unacceptable level.

 "Once the defendant meets that burden, the plaintiff must establish that the reasons proffered by the defendant were pretextual, [either] by presenting direct evidence that [her] race played a role in the challenged action or indirectly by creating a genuine issue of material fact regarding the sincerity of the proffered reasons for that action." *Id.* Again, Ghosh presents limited evidence that the reasons given by SIU for her dismissal were a pretext to cover up the three reasons for her dismissal.

Ghosh cites the early conversation with Kaufmann and Hall during which the subject of her accent and skin color came up. As stated above, this conversation was in the context of the issues that the nurses might have with Ghosh because she was Indian. This could have been contributing to her feeling of isolation. Ghosh also points to conversations with second-year resident Dr. Kristen Green, and Gloria Legg, head of housekeeping at MMC, during which they commented that the nurses were not treating her well because of her race. However, neither Green nor Legg participated in the decision to dismiss Ghosh. Also, the only evidence in support of this conversation is Ghosh's own testimony; there is no affidavit or deposition testimony by either Green or Legg, and thus this evidence is inadmissable hearsay.

Ghosh also claims that she had a conversation with Dr. Janet Albers, a member of the Hearing Committee, during which Dr. Albers purportedly stated that she did not agree with the Hearing Committee's decision and that and there were problems with the Hearing Committee. Again, this testimony is not supported by any deposition testimony of Albers, nor did she file an affidavit; Ghosh relies strictly on her own affidavit to support this claim. Self-serving affidavits without proper factual support in the record will not defeat a motion for summary judgment. *Slowiak v. Land O'Lakes,* 987 F.2d 1293, 1295 (7th Cir.1993).

Ghosh also claims that Rockey should not have been a member of the Grievance Hearing Committee because of his "social and professional" closeness to Kaufmann and that this relationship would provide Kaufmann's position with an unfair advantage. Prior to the hearing, Ghosh requested that Rockey recuse himself, which he refused. Rockey was the Associate Dean for Clinical Affairs and had been a member of Grievance Hearing Committees in the past. Ghosh does not claim that she had knowledge or evidence of any bias on the part of Rockey or otherwise point to any evidence indicating that he could not be an impartial reviewer.

Ghosh requested a Internal Review of the Department of Ob/Gyn, critical of Kaufmann, which she claims Rockey refused to provide. As indicated in the letter from Ghosh requesting this review, the review may not have been complete at the time of request. The record does contain a response to a Illinois Freedom of Information Act request in which Getto states that certain documents would not be disclosed. However, the record does not indicate that Ghosh did not receive the requested document as the result of any

discriminatory intent or for some other invidious reason.

Ghosh also presents a letter written by four former residents of the SIU Ob/Gyn program airing complaints against the program. The Court need not examine the contents of this letter because none of these four former residents has come forward in deposition, affidavit, or other admissible form. Absent a proper foundation establishing that the evidence in question will be admissible at trial, it may not be relied on at the summary judgment stage.

Therefore, even when viewed in a light most favorable to Ghosh, she has not provided evidence which could lead a reasonable jury to conclude that the legitimate reasons proffered for her dismissal were pretextual. The mere fact that Rockey refused to recuse himself, absent evidence of his bias or prejudice, is insufficient to present a triable issue of fact. Therefore summary judgment for all SIU Defendants with respect to the § 1981 claim is appropriate.

## II. Claims Against Memorial Medical Center

Both claims remaining against MMC are similar to the above stated against SIU Defendants: that Ghosh was a victim of employment discrimination and that she was fired in retaliation for opposing discrimination based on her national origin. Each claim arises under Title VII of the Civil Rights Act of 1964, and relies on the proposition that MMC was Ghosh's employer under Title VII. The issue of Ghosh's employment status and the claims against MMC are set forth below.

### A. Was Memorial Medical Center an Employer under Title VII Analysis?

A threshold issue in this case is whether MMC was Ghosh's "employer" for purposes of Title VII. Whether MMC was Ghosh's employer depends on whether she was an employee. To determine whether an individual is an employee or an independent contractor within the meaning of Title VII, the Seventh Circuit has adopted the "economic realities" test set forth in *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377 (7th Cir.1991). Commonly referred to as the *"Knight* test," the Court examines five factors to determine whether an employer/employee relationship exists:

(1) the extent of the employer's control and supervision over the worker, including directions on scheduling and the performance of work; (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace; (3) responsibility for the costs of operation, such as equipment supplies, fees, licenses, workplace, and maintenance of operations; (4) the method and form of payment and benefits; and (5) length of job commitment and/or expectations.

*Worth v. Tyer*, 276 F.3d 249, 263 (7th Cir.2001) *citing Knight*, 950 F.2d at 378–79. The employer's right to control the worker's actions is the most important factor in this analysis. *Knight*, 950 F.2d at 378.

Initially, Ghosh makes the half-hearted argument that the *Knight* test is inappropriate because the Affiliation Agreement uses the term of "house staff" when referring to residents and fellows. She claims that because the test does not address "house staff," and because the test relates only to the question of whether an individual is an employee or an independent contractor, the test does not apply. However, the Affiliation Agreement's use of this term is merely a matter of economy, obviously combining residents and fellows under the umbrella term "house staff." Ac-

cordingly, the Court finds that the test is an appropriate method of weighing the material factors to determine her purported status as an employee.

The Physicians Agreement contains the responsibilities and duties of MMC, SIU, and Ghosh. Under the Agreement, MMC had many responsibilities to Ghosh including:

> (1) paying her monthly salary; (2) providing her with professional liability coverage under MMC's insurance program; (3) providing health, dental, disability, and life insurance; (4) providing sleeping quarters and meals during night and weekend duty; (5) and providing her with paid vacation, educational leave, child care leave, bereavement leave, sick leave, and unpaid leave.

While these responsibilities all point toward the existence of an employer/employee relationship, a closer analysis of each point of the *Knight* test is warranted.

The first and most important prong of the *Knight* test analyzes the control and supervision that the employer has over the individual. The Physicians Agreement states that the duties assigned to Ghosh as part of the residency program were subject to the approval of MMC. Ghosh did not make her own schedule, which would be indicative independent contractor status. Furthermore, under the Physicians Agreement, MMC was allowed to suspend Ghosh for reasonable cause, and MMC could also terminate the Physicians Agreement by joint decision with SIU.

The second prong questions if the kind of occupation involved requires unique skills that are obtained in the workplace. An individual's unique work skills may indicate independent contractor status; however, if the individual requires substantial training and supervision, an employer/employee status is more likely. *Spirides v. Reinhardt,* 613 F.2d 826, 832 (D.C.Cir.1979); *Knight,* 950 F.2d at 380.

Ghosh was working at MMC as part of a residency program, the objective of which was for her to gain a medical educational and specific training. The undisputed facts indicate not only that Ghosh required substantial training and supervision, but that obtaining medical skills was the major purpose of her position.

The third and fourth prongs of the test ask who bears the costs of operations and facilities and who pays the individual's salary and benefits. MMC did supply the facilities and patients for Ghosh to work with. While SIU was responsible for teaching, supervising, and evaluating Ghosh, evidence indicates that clinical faculty at MMC also participated in her supervision and education. In addition to the lengthy list of compensation and benefits provided by MMC, they also prepared and submitted an IRS W–2 form that identified MMC as Ghosh's employer.

The fifth and final prong of the test inquires into the length of time and/or expectations the job requires. The Physicians Agreement states that Ghosh was contracted to work for one year, which would automatically renew for additional one-year periods until the completion of her residency. The substantial amount of time contemplated in the contract indicates that the parties intended the relationship to extend over a period of at least multiple years. Furthermore, the Physician's Agreement lists many expectations that Ghosh was required to meet in order to fulfill her obligation to MMC.

▮ When viewed in a light most favorable to Ghosh, all elements of the *Knight* test point toward the existence of an employer/employee relationship. MMC exhibited a level of control over Ghosh, provided facilities and some training, entered into a automatically renewable contract with her, and compensated her with a salary and substantial benefits package.

Therefore, when viewed in a light favorable to Ghosh, MMC was Ghosh's employer for Title VII purposes.

## B. Discrimination on the Basis of National Origin: Title VII

Ghosh claims that MMC violated Title VII of the Civil Rights Act of 1964 by discriminating against her based on her national origin as an Indian. Discrimination claims brought under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act are analyzed under the same rules. *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 176 (7th Cir.1996). Ghosh does not present direct evidence of discrimination by MMC; therefore, the Court will again analyze Ghosh's claim under the indirect evidence test set forth in *McDonnell Douglas.*

As stated above, in order to establish a *prima facie* case of discrimination using indirect evidence, Ghosh must demonstrate four elements: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) the employer treated similarly situated individuals not in the protected class more favorably. *See McDonnell Douglas* 411 U.S. at 802, 93 S.Ct. 1817 (1973).

Again, Ghosh is Indian and therefore is a member of a protected class, satisfying the first prong of the test. She also meets the third prong of the test because she suffered a materially adverse employment action when the Physicians Agreement was terminated by joint action of SIU and MMC. Therefore, the Court must only analyze the second and fourth prongs of the test.

■■■■ The arguments with respect to the second and fourth prongs are synonymous with the analysis under the 42 U.S.C. § 1981 claim contained above. Accordingly, the Court finds that a reasonable jury could find that Ghosh was meeting MMC's legitimate employment expectations and that Dr. Smith was a similarly situated individual. However, Ghosh does not present any additional evidence from the § 1981 claim that a pretext for discrimination existed. Therefore, the Court finds that Ghosh is unable to establish that MMC had an illegal, discriminatory motive for releasing her early from her residency and summary judgment on for the Title VII claim is appropriate.

## C. Retaliation for Opposing National Origin Discrimination: Title VII

■■■■ Ghosh claims that she was retaliated against for opposing discrimination based on her national origin as Indian, in violation of Title VII. Under the direct method of proving retaliation, a plaintiff must present direct evidence of: (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two. *Rhodes v. Illinois Dept. of Transportation,* 359 F.3d 498, 508 (7th Cir.2004). Although other formulations of an indirect *prima facie* case of retaliation have been used in the past, the Seventh Circuit has recently clarified that a *prima facie* case of retaliation under the indirect method required the following showing:

> [A]n employee must demonstrate that: (1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate expectations, she suffered a materially adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.

*Id.; Hilt–Dyson v. City of Chicago,* 282 F.3d 456, 465 (7th Cir.2002), *citing Stone v. City of Indianapolis Pub. Utils. Div.,*

281 F.3d 640, 644 (7th Cir.2002); *Spencer v. Thomas*, 30 Fed.Appx. 636 (7th Cir. 2002); *Williams v. Waste Management of Illinois Inc.*, 361 F.3d 1021 (7th Cir.2004). Because Ghosh suffered an adverse employment action when the Physician's Agreement was terminated, the Court must analyze only prongs one and three of the direct method.

To meet the first prong of the direct method of proving retaliation, the plaintiff must have "[opposed] any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). Specifically, to establish a statutorily protected activity, Ghosh again claims that she was dismissed in retaliation for exercising her First Amendment right to freedom of speech by speaking out on matters of public concern. As discussed above this claim must fail because Ghosh has not established that the issues she spoke out about were matters of public concern. Also, Ghosh has not presented evidence of a causal connection between the alleged statutorily protected activity and the termination of the Physician's Agreement; therefore, even when viewed in a light most favorable to Ghosh, she has failed to establish direct evidence of retaliation.

In the absence of direct evidence, "failure to satisfy any element of the *prima facie* case proves fatal to the employee's retaliation claim." *Hilt–Dyson*, 282 F.3d at 465. As discussed above, Ghosh was able to satisfy prongs two and three of the *prima facie* case because she suffered an adverse employment action when the Physician's Agreement was terminated and she was able to demonstrate that she may have been performing her job according to her employer's legitimate employment expectations under the *McDonnell Douglas* analysis. However, Ghosh has failed to satisfy the first and fourth prongs of the *prima facie* case because she has not presented evidence to establish that she engaged in a statutorily protected activity

and has not to established that MMC had an illegal, retaliatory motive for terminating the Physician's Agreement early. Therefore, the Court finds that Ghosh has failed to demonstrate that MMC retaliated against her, in violation of Title VII, for opposing racial discrimination by either direct or indirect evidence and summary judgment for MMC is therefore appropriate.

## CONCLUSION

For the reasons set forth above, SIU and the Individual SIU Defendant's (Carl J. Getto, M.D.; Robert C. Kaufmann, M.D.; Tammie Klein, M.D.; Paul H.Rockey, M.D.; Scott MacGilvary, M.D.; and Laura Powers, M.D.) Motion for Summary Judgment [# 87] is GRANTED and MMC's Motion for Summary Judgment [# 90] is GRANTED. This matter is now TERMINATED.